UNITED STATES of America

v.

ZARINTASH, Shahbaz Shane a/k/a "John", Appellant.

UNITED STATES of America

v.

Madelaine WASSERMAN, Appellant.

Nos. 83–5445, 83–5446.

United States Court of Appeals, Third Circuit.

Argued on Feb. 28, 1984.

Decided May 21, 1984.

As Amended June 1, 1984.

Herald Price Fahringer (argued), Lipsitz, Green, Fahringer, Roll, Schuller & James, New York City, Michael B. Pollack, New York City, for appellant Shahbaz Shane Zarintash.

Judd Burstein, Shargel & Burstein, New York City, for appellant Madelaine Sara Wasserman.

W. Hunt Dumont, U.S. Atty., Samuel Rosenthal, Chief, Appeals Div. (argued), Newark, N.J., for appellee.

Before SEITZ, Chief Judge, GARTH, Circuit Judge, and DIAMOND, District Judge *.

## OPINION OF THE COURT

GARTH, Circuit Judge.

Madelaine Sara Wasserman and Shahbaz Shane Zarintash appeal from their convictions for conspiracy to import, possess, and distribute hashish, and possession of hashish.[1] Wasserman and Zarintash raise a

---

\* Honorable Gustave Diamond, United States District Judge for the Western District of Pennsylvania, sitting by designation.

1. On February 23, 1983, a federal grand jury sitting in Newark, New Jersey, returned a five-count superseding indictment against Wasserman (named as "Jane Doe"), Zarintash, and seven others (Anthony Clarke, Charles Minnig, Colin Furness, Gregory George Lill, Robert Bauer, Raymond Zeman, and Dennis York). Count 1 of the indictment charged that the defendants took part in a conspiracy between March 1, 1981 and March 31, 1982, to import 36,000 pounds of hashish, in violation of 21 U.S.C. § 960(a)(1) and (b)(2) (1982). Count 2 charged the defendants with conspiracy to possess the same with intent to distribute, a violation of *id.* § 841(a)(1) and (b)(6), which conspir-

acy violated *id.* §§ 846 and 963. Count 3 charged them with possession of the same on the high seas with intent to distribute, in violation of *id.* § 955a(9) and 18 U.S.C. § 2. Count 4 charged them with attempt to possess the same with intent to distribute, in connection with a salvage effort on October 31, 1981, a violation of 21 U.S.C. § 955a(9), which attempt violated 21 U.S.C. § 963 and 18 U.S.C. § 7. Count 5 charged the same offense on October 22, 1981.

Three of the seven defendants named in this indictment entered guilty pleas. A fourth was severed during trial. On April 21, 1983, the jury returned a verdict of guilty on all counts as to Wasserman and Zarintash; the other tried defendant (Colin Furness) was found not guilty.

number of issues, only some of which merit discussion. Zarintash contends the district court abused its discretion in refusing to reread a portion of the testimony to the jury. We agree with Zarintash, and we reverse his conviction and remand for a new trial.

Wasserman claims that the court impermissibly admitted evidence (including $32,960 in cash) seized from her person and her apartment after her arrest because it was "poisonous fruit" of an illegal search of her apartment. We do not agree that the evidence was inadmissible "poisonous fruit."

Wasserman also contends that the admission into evidence of the $32,960 in cash was irrelevant and prejudicial, thus impermissibly admitted. Zarintash joins her in this contention. We agree that the evidence was wrongly admitted, but find the error to be harmless.

We therefore reverse the conviction of Zarintash and affirm the conviction of Wasserman.

## I.

The evidence adduced at trial may be briefly summarized. The Government alleged a group of conspirators met several times in the Westbury and Alrae hotels in New York City during the week of October 3—October 7, 1981 to plan the importation of a shipment of hashish. Among those at the meetings was Wayne McDonald, who testified for the Government. McDonald identified Zarintash as the "John or Tito" who had been present at the meetings. He also identified Wasserman as the "Sarah" who was there with Les Riley. The group agreed that they would obtain the hashish from the "mother ship" (on which it was being transported from Lebanon) by transferring it to smaller boats when the mother ship was off the coast of New Jersey. Wasserman was to be in charge of the delivery ashore and transportation elsewhere (in which she would be assisted by

William Beaty), and she was to receive ten percent of the cargo (which the DEA later estimated to be worth $36 million). "John" was to receive one-sixth of the cargo. Riley and "John" agreed to pay McDonald $200,000 for his part in the operation.

Beaty asked John Clark to help with the plan; Clark enlisted Robert Soleau's aid. Soleau would provide two boats: the "Falcon" to transport the cargo from the mother ship to shore and the "Tanqueray" to transport people separately.

On the night of October 9, 1981, the two boats set out for the mother ship. The hashish was loaded aboard the Falcon, but it sank before reaching shore. The conspirators aboard the Tanqueray returned to shore. McDonald, Wasserman, "John," and others met several times in Manhattan, at which time they discussed salvaging the cargo. Wasserman and Michael Abell were to arrange for divers to bring the cargo up. Soleau and others went to the spot where the Falcon sank, but the diving operation was twice interrupted, once by bales of hashish washing up on shore, and once by Coast Guard helicopter surveillance. The Government recovered most of the cargo and, through cooperating witnesses (including Soleau and McDonald), identified Wasserman, Zarintash, and others as conspirators.[2] Wasserman was arrested on February 17, 1983; the Government then alleged she was the "Jane Doe" a/k/a "Sarah" named in the February 23 indictment. Zarintash was with her at the time of her arrest; he was arrested later that evening.

At trial, which began March 30, 1983, the government presented extensive testimonial evidence against Wasserman, principally that of McDonald and Abell. McDonald's testimony provided the major part of the evidence against Zarintash.

## II.

Zarintash contends that the district court abused its discretion in refusing to read the

**2.** Defendants William Beaty and John Ballouz were indicted, tried, and convicted separately. This court affirmed the conviction of Beaty, and reversed and remanded Ballouz's case for a new trial. *United States v. Beaty,* 722 F.2d 1090 (3d Cir.1983). Three others (E. Robert Soleau, Patrick Connell, and John Clark) were indicted with Beaty and Ballouz. They pled guilty.

testimony of Kevin Keating to the jury. We agree.

### A.

Kevin Keating testified, on behalf of Zarintash, that he had been with Zarintash between (about) October 1 and October 6, 1981. Between (about) October 1 and October 4, the two were at Shrub Oak, New York, about 45 miles from Manhattan, working on a screenplay. According to Keating, the two traveled to New York City on the evening of the 4th to attend a birthday party for Zarintash in the Knickerbocker Restaurant at around 8 p.m. Keating left at about 11 p.m.; Zarintash had been there the entire time. Keating testified that he next saw Zarintash late in the morning of the next day (Oct. 5), when they met in the city to work on the screenplay. They were together in New York until the evening, when they drove back together to Shrub Oak. Zarintash was there until the evening of the 7th, when he drove back to New York City.

Hart Perry testified that he saw Zarintash in Shrub Oak on October 3 and 4, at the Knickerbocker party until 2:30 a.m., on October 6 in New York, and on the morning of October 7, when he drove Zarintash from Shrub Oak to Manhattan. Stephen Jones confirmed that Zarintash was at the birthday party on October 4. Michael Abell testified that he did not recognize Zarintash as being present at the two meetings he had attended for some time at which McDonald was also present.

In contrast to this testimony, Wayne McDonald testified for the Government that Zarintash was the "John or Tito" who was present at the conspiracy meetings at the Westbury and Alrae hotels in New York City between October 3 or 4, and October 7, 1981, and at salvage meetings later that month.

Keating's testimony contradicts McDonald's testimony in two ways. First, it provides Zarintash with an alibi for any meetings that took place at the Westbury Hotel on October 3 or 4, on October 5 at the Alrae Hotel in the late morning through night, and on October 7 at the Alrae until the late evening.[3] Second, by providing an alibi, it casts doubt on McDonald's identification of Zarintash as the "John or Tito" who attended these meetings, and others, including meetings to plan the salvage operation.

While deliberating, the jury sent out a note reading, "Could we see the transcript of Keating's testimony?" The court refused this request, informing the jury that the reason for its refusal was that "within these volumes is far more than simply the testimony of the witness," including "a lot of proceedings that took place outside of your presence." The court stated that there were, "[e]ven during the testimony of witnesses," sidebar conversations that the jury was not supposed to hear. Defense counsel then noted that there were no such proceedings or conversations in the transcript of Keating's testimony. The court reaffirmed its refusal, stating "I am not sending volumes in there, nor am I taking a scissors and cutting out pieces of testimony."

The court also denied defense counsel's request to construe the note as a broad request by the jury to review the testimony by any permissible means, including having it read to them. In addition, the court refused to tell the jury that they could request to have the testimony read to them. The court stated that it was completely within the court's discretion whether to read the testimony to the jury.[4]

### B.

A trial court has broad discretion in deciding whether to accede to a jury's

---

**3.** McDonald's testimony is not clear as to the times of the various meetings, or the exact date of the first Westbury Hotel meeting.

**4.** MR. POLLACK: ... [I]s the Court going to apprise them of their right to have the testimony [read] if that is their wish?

THE COURT: First of all, they have no such right. I don't intend to apprise them of it.
They have—they may have testimony read if I decide to read it to them. But first they have to ask for it.

request for a reading of testimony. *United States v. Chrzanowski*, 502 F.2d 573, 577 (3d Cir.1974); *United States v. Rabb*, 453 F.2d 1012 (3d Cir.1971); *United States v. Chicarelli*, 445 F.2d 1111 (3d Cir.1971). But this discretion is based upon a limited, twofold rationale: first, that requests to read testimony may slow the trial where the requested testimony is lengthy; second, that reading only a portion of the testimony may cause the jury to give that portion undue emphasis. *Rabb, supra*, 453 F.2d at 1013–14. Thus, *Rabb* holds that a trial judge abuses his discretion where the refusal to read requested testimony is not supported by one of these reasons. *Id.; compare Chrzanowski, supra*, 502 F.2d at 576 (no abuse of discretion).

In the case *sub judice*, the court's decision not to read Keating's testimony was based on its finding that the jury's request was to *see* the actual transcript, as distinct from having the testimony read to the jurors. Unquestionably the jury's note asked to see the actual transcript. Yet we are unimpressed with the distinction drawn by the district court between a request to see the transcript and a request to have the testimony read. We are persuaded that neither *Rabb* nor *Chicarelli* holds such a distinction to be material.

First, the court's stated reason for refusing to permit the jury to see the testimony—i.e., that sidebar proceedings were disclosed in the transcript—is unsupported by the record. No proceedings took place out of the presence of the jury or at sidebar during Keating's testimony. The fact that such proceedings were recorded in other parts of the record is not relevant, because the jury did not ask to see anything but Keating's testimony, which occupied a discrete portion of the record.

■ Second, the court erred in holding that the distinction between the request to

"see" the testimony and one to "rehear" the testimony was sufficient to give the court unlimited discretion not to offer to read the testimony to the jury. In *Rabb* this court noted that the distinction between on the one hand, asking a specific question based on the evidence, which requires the court to read back the relevant testimony, *United States v. Jackson*, 257 F.2d 41 (3d Cir.1958), and on the other hand, asking to hear certain testimony read, was "a distinction of form, not substance." 453 F.2d at 1014. By asking to *see* certain testimony, the jury—like the juries in *Jackson* and *Rabb*—showed that it was "attentive and remembered the case well enough to know which parts of the testimony would be relevant to an implied question," *id*. At the very least the court should have asked the jury whether the jurors wanted to hear the testimony read before determining that issue for itself.[5] Although defense counsel requested the court to make such an inquiry of the jury, such a request is not a prerequisite to the responsibility of the trial court to determine the exact contours of the jury's interest in the testimony. It is sufficient that the jury requests to see a portion of the testimony.

Nor do we find that this error was harmless. Neither of the rationales articulated in *Rabb* for refusing to read testimony applies here. The Keating testimony was not lengthy. It consisted of only 20 pages; indeed it is half the length of the testimony that the *Rabb* court held to be not too long to read. 453 F.2d at 1014. *Compare Chrzanowski, supra*, 502 F.2d at 576 (testimony very long, no abuse of discretion to refuse to read). And as noted above, Keating's testimony severely impeached McDonald's testimony. McDonald's identification of Zarintash as "John or Tito" was the major piece of evidence against Zarintash.

---

5. The court apparently took judicial notice that the jurors probably preferred to see the transcript.

It may well be they don't want to sit here and listen to somebody drone on and on reading. It is a lot easier. They can sit around thumbing through the pages.

Every time this has happened to me in the past I've made that answer and every time that's the end of it. Because they simply think it is easy to pass them around. Very frequently the jurors don't want to come back out here and be here while the testimony is being read. (App. 2691.)

Thus as in *Rabb,* the jury asked to review testimony which was crucial to identification, to say nothing of testimony which otherwise bolsters Zarintash's alibi.

Nor was the evidence in Zarintash's favor so extensive that the request would unduly emphasize a small portion of it. Perry and Jones corroborated some of Keating's testimony, but Keating's evidence was much more extensive and detailed. Hence, like *Rabb,* "[t]his was not a case where, from a mass of dimly remembered data, the jury desired to cull and spotlight a small bit of fact." 453 F.2d at 1014. Rather, it was testimony that went to the heart of the jury's determination of guilt or innocence.

Because the district court's abuse of discretion was not harmless, we reverse Zarintash's conviction and remand for a new trial.

### III.

■ Both Zarintash and Wasserman contend that the court abused its discretion in permitting the admission into evidence of $32,960 in cash that was found in Wasserman's apartment on the day of her arrest. They claim this evidence was irrelevant. Drug Enforcement Agency Agent Maher testified, over defendants' objections, that he and the other agents who conducted a post-arrest search of her apartment discovered the cash in a space between the kitchen sink cabinet and the wall, behind a piece of wood that covered the space. The theory under which the court admitted the evidence was that it was probative of the defendants' ability to engage in the wholesale drug smuggling business. The court found that the cash was a kind of tool-of-the-trade, in that financing this large-scale drug importation scheme would require "fabulous amounts of money in ... United States currency" to be paid to the many persons involved "in order to finance and keep the operation ongoing."

The district court went on to state:

This is not some case where somebody is accused of robbing and stealing a specific amount of money from a specific insti-

tution and then the question is whether or not the amount of money found in [sic] their person later has any relationship to the crime. This money found in this way in such a place is relevant to the issue of whether these people were together in business, that business requiring, as it would, a substantial amount of cash to finance it, whether or not these people had that kind of cash available, and whether or not they were in a position to fulfill the promises that others have testified here they made throughout and during the lifetime of the conspiracy. (App. 2134)

We hold that the evidence was inadmissible. As conceded by the district court, this is not a situation where possession of money subsequent to the commission of a crime is evidence that "fruits" of the crime were received. *Compare, e.g., United States v. Kenny,* 462 F.2d 1205 (3d Cir.) (money and bonds relevant to show defendants were bribed), *cert. denied,* 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972). Here, the defendants were never charged with *receiving* money. Instead, the possession of money was evidence of their ability to *pay* others in order to carry out the operation.

There was, indeed, evidence that Wasserman and Zarintash promised to pay participants who were not receiving a cut of the cargo. For example, McDonald testified that Wasserman agreed to pay the divers $25–30,000 for their part in the salvage operation and that "Captain Mike" had told him Wasserman had promised to pay him $100,000 to head the salvage operation. McDonald also testified that Zarintash and Riley promised to pay him $200,000. Thus the court's finding that the participants needed cash at some point in the conspiracy is supported by the record. We do not decide whether the district court was correct to hold that possession of money could in certain circumstances be probative of participation in a drug conspiracy. Even assuming, *arguendo,* that such a theory could support the admission of evidence of possession of cash, the probative value of

the evidence here is simply insufficient to be relevant to the proposition.

The $32,960 was found nearly a year after the alleged conspiracy ended, and the record discloses nothing else to connect that money to the conspiracy (such as specially marked envelopes, etc.). Possession of cash, even such a relatively large amount as was found here, is not in itself probative of the proposition that *a year before*, the possessor had the ability to make large payments. Instead, it is more akin to evidence of a defendant's "bad character": the jury might "believe that the accused had in his possession more money than a man in his position could have obtained by honest methods, and therefore must be guilty." *Williams v. United States*, 168 U.S. 382, 391, 18 S.Ct. 92, 95, 42 L.Ed. 509 (1897).

■ This evidence of a large sum of money was also admitted against Zarintash. It is proper to admit evidence of another's possession of money, where the money is satisfactorily connected by other circumstances to the defendant and his alleged offense. *United States v. Crisp*, 435 F.2d 354, 360 (7th Cir.1970), *cert. denied*, 402 U.S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 116 (1971). Where money found on another's property is offered against a defendant, however, there must also be a connection between the defendant and the property. *United States v. Williams*, 561 F.2d 859 (D.C.Cir.1977). Here, although there was evidence that Zarintash had access to Wasserman's apartment,[6] the probative value of cash found in Wasserman's apartment a year after the end of the alleged conspiracy is even thinner with respect to Zarintash's participation than it is with respect to Wasserman's. Thus, this evidence was inadmissible as to both Wasserman and Zarintash.

■ The mere admission of inadmissible evidence does not, however, constitute reversible error. The question is whether the error had substantial influence on the minds of the jury. *Government of the*

*Virgin Islands v. Bedford*, 671 F.2d 758, 762 (3d Cir.1982); *see Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). "Unless 'there is a reasonable possibility that [the error] contributed to the conviction, reversal is not required.'" *Bedford*, 671 F.2d at 762, *quoting Schneble v. Florida*, 405 U.S. 427, 432, 92 S.Ct. 1056, 1060, 31 L.Ed.2d 340 (1972).

■ Here, we are satisfied that there is no reasonable possibility that the admission into evidence of the $32,960 had a substantial influence on the jury's decision that Wasserman was guilty. The other evidence against Wasserman, apart from the $32,960, was overwhelming. It included the testimony of admitted participants in the scheme, Wayne McDonald, Michael Abell, John Clark and Dennis York. These men testified to Wasserman's heavy involvement in the organization of the operation. They testified that she provided the money to pay participants in the scheme. "Error is more easily excused if the evidence of the defendant's guilt is overwhelming." *United States v. Baker*, 693 F.2d 183, 189 (D.C.Cir.1982); *see Bedford, supra*, 671 F.2d at 762 (overwhelming evidence lessens possibility of substantial influence on jury of inadmissible evidence). Furthermore, the Government in its summation did not mention, let alone stress, her possession of the $32,960. We hold that the error was harmless.

We need not decide whether the error in admitting the money in evidence as to Zarintash was reversible or harmless error inasmuch as we have already concluded that Zarintash's conviction must be reversed (see part II *supra*).

### IV.

Wasserman also challenges the admission into evidence of the $32,960 in cash previously discussed, as well as false identification papers, found in her Gramercy Park apartment on the day of her arrest, on the ground that this evidence consti-

---

**6.** When arrested, Zarintash had keys to Wasserman's apartment.

tutes "poisonous fruit" of an illegal search made in February 1981. In 1981, federal agents executed an illegal,[7] warrantless search of Wasserman's Greenwich Village apartment (her residence at the time). The agents were conducting an investigation into the drug-related activities of Charles Minnig, then Wasserman's boyfriend.

During the search, the agents found a photograph of Wasserman. Later, Drug Enforcement Agency agents used the photograph while investigating the hashish smuggling operation at issue here. Agent Catanese testified that they had received information from several sources about a "Sarah" who was involved in the smuggling operation, and they had a description of her. The agents displayed the photograph to people who had reported that a "Sarah" was involved; none could identify "Sarah" before being shown the picture, but all identified the picture as one of "Sarah." At the time, the agents knew the woman in the picture as "Michele Christine Fallon." Agent Catanese was then put in touch with an informer, Steve Malone. Catanese knew a "Sarah" had been involved with the operation at a high level, and knew "Sarah" was associated with Charles Minnig. In an interview with Catanese in February 1983,[8] Malone said he knew a Sarah (describing her), who was involved with drug importation, and was associated with Charlie Minnig or Medick; he had met both Minnig and "Sarah" in Houston about two years earlier. Malone knew that he could get in touch with Sarah by calling an 800 number and asking for the name Taylor. Malone's description of Sarah matched the one Catanese had of his "Sarah."

After Malone described the Sarah he knew, Catanese exhibited a book of photographs, and asked Malone to select people he thought he knew. Among four or five others he identified, Malone also picked out the photograph of Wasserman and said that that photograph was a picture of "Sar-

ah." Catanese asked if Malone could get in touch with "Sarah"; Malone said he could use the 800 number, and Catanese asked him to "reach out" for her. Malone did so. He had met "Sarah" for lunch about a week before he called her in February, 1983. They decided to meet on February 17, 1983 at a restaurant called Pete's Tavern. Catanese told Malone to have a general conversation with her. With Catanese observing, Malone waited in Pete's. Wasserman entered, and walked directly over to Malone and greeted him. They left the restaurant for another one. Catanese took up a surveillance position, and later observed Wasserman walking from Irving Place, and making a call from a phone booth. He followed Wasserman to 11 Gramercy Park South. Later that afternoon, at about 2:30 p.m., Malone met with Catanese and told him about his conversation with "Sarah."

Catanese returned to the area, observed Wasserman walking outside 11 Gramercy Park South, with Zarintash, and placed her under arrest. In the evening of that day, the agents obtained a search warrant for the 11 Gramercy Park apartment, where they discovered the $32,960 and the false identification papers.

Wasserman argues that this evidence is inadmissible because it consists of "poisonous fruit" of the illegally discovered photograph and is therefore inadmissible. *See Wong Sun v. United States*, 371 U.S. 471, 484–88, 83 S.Ct. 407, 415–17, 9 L.Ed.2d 441 (1963). Wasserman contends that the exploitation of the photograph led directly to the identification of Wasserman as the "Sarah" involved in the conspiracy, and thus to the arrest and search warrant.

■ Evidence is not inadmissible "simply because it would not have come to light but for the illegal actions of the [authorities]"; rather, the question is whether the evidence has been discovered by means suf-

---

7. The Government conceded in the district court that the search was illegal.

8. The district court credited Malone's testimony that the first meeting occurred in February 1983, and not November or December 1982, as Catanese testified.

ficiently distinguishable to be purged of the primary taint. *Wong Sun, supra,* 371 U.S. at 488, 83 S.Ct. at 417. The evidence is not inadmissible if the Government learned of the evidence from an independent source. *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 183 (1920). It is also admissible if the Government agents would have found the evidence without the illegal action. *Government of the Virgin Islands v. Gereau,* 502 F.2d 914, 927–28 (3d Cir.1974), *cert. denied,* 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975). In this case, either theory would support the admission of the evidence found in Wasserman's apartment.

■ The district court ruled that the agents' identification of Wasserman as "Sarah" through Malone's information did not depend on Catanese's use of the photograph. The court found that Malone did not need the photograph to know that the "Sarah" whom Catanese was investigating was the "Sarah" he (Malone) knew from the meeting in Houston, and whom he could reach with the 800 phone number. Moreover, Wasserman immediately recognized Malone at Pete's; she walked over and greeted him without the need to introduce herself. Therefore, the court ruled, the evidence was admissible.

Under either of two theories, the evidence was admissible. First, Malone's identification is an independent source. There is sufficient support in the record for the court's ruling that Malone did not need the photograph to know that the Sarah he met at the restaurant was the Sarah whom Catanese had described to him. The court found that Malone "knew who Catanese was talking about without the aid of the photograph and that Catanese knew who he [Malone] was talking about without the use of the photograph." Each knew enough salient facts about "Sarah" (that a "Sarah" was in league with Charlie Minnig and was involved in drug purveying at a high level) that they must have known they were talking about the same individual. Then, at the restaurant, Wasserman recognized Malone and greeted him; thus, with-

out reference to the photograph, each had recognized the other. No more is required to support the court's finding that Malone did not need the photograph to identify Wasserman to the agents as his *and* the agents' "Sarah." Malone's identification thus did not depend on the photograph, and is an independent source for the discovery of the evidence.

The same facts support a holding that the agents would have inevitably discovered the evidence without the photograph. As previously noted, Malone did not require the photograph to know the "Sarah" about whom Catanese was inquiring. As the district court found, it was "inconceivable" that without the photograph Malone would not have said that he knew the person to whom Catanese was referring, that he could get in touch with her, that Catanese would tell Malone to communicate with her, and that he would do so. Thus the Government inevitably would have been led to Wasserman, and to the evidence. *Cf. Gereau, supra* (Government would have discovered gun without use of illegally obtained statement by defendant that he had thrown gun out window).

Under either of these theories, the illegally obtained photograph was not necessary to the agents' being led to Wasserman. At most, the photograph was, as the district court found, "an aid to pinpointing who Sarah was," to confirm what Malone and Catanese had already agreed was the case—*i.e.* that Malone's Sarah (Wasserman) was the Sarah for whom the agents were looking as the "Sarah" involved with Minnig in a drug smuggling operation. Accordingly, we are satisfied that the challenged evidence was not inadmissible as "fruit of the poisonous tree," *see Wong Sun, supra,* 371 U.S. at 487–88, 83 S.Ct. at 417–18.

## V.

Wasserman and Zarintash also raise other challenges to their convictions. Because we have determined that Zarintash must be tried anew, we have considered these is-

sues only as they relate to Wasserman,[9] and we find them without merit:

(a) that the court made prejudicial remarks on the evidence when giving a *"Barber"* charge (see *United States v. Barber*, 442 F.2d 517, 528 (3d Cir.), *cert. denied*, 404 U.S. 846, 92 S.Ct. 148, 30 L.Ed.2d 83 (1971));

(b) that the Government withheld exculpatory statements of a cooperating witness (Roy Riley);

(c) that the court abused its discretion in failing to give a "missing witness" instruction as to Roy Riley;

(d) that the admission of evidence that Zarintash had appeared before a federal grand jury in connection with a West Virginia drug prosecution was evidence of "other crimes" whose admission was a denial of due process and a fair trial;

(e) that the indictment was multiplicious;

(f) that Zarintash was unlawfully stopped, arrested and searched, and the fruits of that conduct should have been suppressed;

(g) that there was insufficient evidence to support the convictions;

(h) that the indictment should be dismissed on the ground that women were underrepresented as grand jury "forepersons";

(i) that the conspiracy charge was duplicitous;

(j) that the court's supplemental instruction [10] improperly encouraged the jury to convict the defendants on Counts 3, 4 and 5.

## VI.

We will therefore reverse the conviction of Zarintash and as to Zarintash, will remand for a new trial. We will affirm the conviction of Wasserman.

**9.** Each of Zarintash and Wasserman's briefs cross-referenced the other, and by incorporating each other's issues raised them before us. See Fed.R.App.P. 28(1).

**10.** During its deliberations, the jury asked the court, "If found guilty on counts 4 and 5 [the substantive charges respecting the salvage operation], is a person then automatically guilty on counts 1 and 2 [the conspiracy counts]?" The court answered as follows:

> There is no such thing as automatically guilty. Each count represents a separate allegation. That is not to say that the way the indictment was structured that the counts are not unrelated to each other. For, obviously, there is a relation at least in terms of the government's theory of the case.
>
> Obviously, one way in which the government contends you may find the defendant guilty on Count 4 and 5 is if you find the defendant a knowing and wilful participant in any conspiracy which had as its object the commission of the crimes charged in either Count 4 or Count 5.
>
> On the other hand, it is perfectly possible for you not to believe beyond a reasonable doubt the person was a member of the conspiracy but still to find beyond a reasonable doubt that they were guilty of the substantive crime charged in either Count 4 or Count 5.
>
> In other words, there is nothing automatic about it. I hope—you know, it is hard for me to know what your concerns are. I'm not supposed to know exactly. I'm just trying to answer your questions. I hope I have at least answered the question that I understand. (App. 2698–99)