**UNITED STATES of America,**

v.

**William CHEN, et al., sub nom., Louis Rupert Garcia, Defendants.**

No. SSSS 84 CR. 664 (MJL).

United States District Court,
S.D. New York.

Jan. 29, 1986.

Rudolph Guiliani, U.S. Atty., S.D. of N.Y., New York City, for U.S. of America.

Theodore T. Jones, Brooklyn, N.Y., for defendant Chen.

## MEMORANDUM OPINION AND ORDER

LOWE, District Judge.

Defendant William Chen moves to suppress certain evidence seized during a search of his home as well as statements which he made during the course of that search. The government strenuously opposes his motion.

*Background*

On September 13, 1984, defendant Chen was indicted along with 29 others, and charged with a conspiracy to violate the federal narcotics laws, under 21 U.S.C. § 846. He was also charged with distribution or possession with intent to distribute heroin or cocaine, in violation of 21 U.S.C. §§ 812 and 841.

Since that time, the government has filed several superceding indictments in this case. The two most recent superceding indictments apparently split what was originally characterized as one conspiracy into two conspiracies to violate federal narcotics laws. All previous motion practice has been incorporated into the new indictments. (Transcript dated January 16, 1986, p. 7).

Defendant Chen is currently named as a defendant on the indictment designated as "SSSS" ("4S"), in which Louis Rupert Garcia (a/k/a "Papo") is the lead defendant. Count One charges defendant Chen and 13 others with conspiracy to violate the federal narcotics laws under 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(A). Overt Act 25 of Count One alleges that:

> On or about September 6, 1984, the defendant WILLIAM CHEN possessed a number of firearms, approximately .69 grams of cocaine, and approximately $28,000 in cash at 134 Highway Avenue, Congers, New York.

Counts Three through Five charge that all 14 defendants possessed with the intent to distribute various amounts of cocaine and heroin seized from the two Manhattan apartments in which Louis Rupert Garcia and Awilda Nieves, another named defendant, lived. Count Six accuses defendant Chen of possession with intent to distribute .69 grams of cocaine found in his home. Counts Two, Seven and Eight do not relate to defendant Chen.

At a pre-trial conference held on January 16, 1986, all references to firearms in the Overt Acts enumerated in Count One of the 4S indictment were stricken, including the reference to firearms contained in Overt

Act 25 pertaining to defendant Chen. (Transcript dated January 16, 1986, p. 38).

The indictment of defendant Chen and the 13 other alleged co-conspirators was based upon evidence gathered during a lengthy investigation which included physical surveillance, undercover work, and court-authorized wiretaps on telephones at three different locations over a three month period.[1] In addition, evidence was obtained as a result of searches conducted in 20 locations throughout the Southern District of New York.

The searches performed in the Southern District were executed pursuant to warrants issued on September 5, 1984 by Judge Cannella of this Court. Judge Cannella found probable cause to authorize the searches on the basis of the September 5, 1984 affidavit of Special Agent Emilio Garcia[2] of the Drug Enforcement Administration ("DEA") ("Rider A").

One of the September 5 warrants empowered Agent Garcia "or any other law enforcement officer" to search the "premises known as 134 Highway Avenue" in Congers, New York. At that time defendant Chen and other members of his family lived at that address.

Defendant Chen challenges that warrant and its execution as overbroad.[3] On November 5, 1985, Chen submitted an affidavit (the "Chen Affidavit") in support of his motion to suppress the evidence seized in the search of the Highway Avenue residence. On December 4, 1985 this Court held a hearing on the merits of Chen's position. The account of the search which follows emerges from the testimony of the three witnesses who appeared at the December 4 hearing: DEA Special Agents Counihan and Emerson, and defendant Chen.

*The Search of Defendant Chen's Residence*

At approximately 4:00 o'clock,[4] on the morning of September 6, 1984, DEA Special Agent John T. Counihan went to the vicinity of defendant Chen's residence at 134 Highway Avenue in Congers, New York. As the team leader of the group of eight DEA agents assigned to arrest defendant Chen and to execute the search warrant on his residence, Agent Counihan arrived about two hours before the scheduled arrest time to familiarize himself with the area. In addition, Agent Counihan contacted the local police department to "obtain the services of a uniformed officer to come with us ... at the time we executed the warrant." (Transcript of December 4, 1985 Suppression Hearing, hereinafter "12/4 Tr.," p. 40).

Agent Counihan testified that he had never before seen the outside or inside of defendant Chen's home. Nor had any other agent been inside the defendant's residence. (12/4 Tr., p. 57). The government indicated that their knowledge regarding the location of defendant Chen's residence was derived from "surveillance and other knowledge concerning this individual [defendant Chen]," but that it was "not exactly sure how we knew Billy Chen lived at

---

1. Conversations were intercepted over the telephones located at (1) the residence of Louis Rupert Garcia at 85 Columbia Street, Apartment 10B, in Manhattan; (2) the residence of John Lewis DeLutro at 166 Mulberry Street, Apartment C2 in Manhattan; and (3) the Caffe Palermo in Little Italy in Manhattan. John DeLutro is now the lead defendant in the indictment designated "SSSSS" ("5S"). DeLutro owns the Caffe Palermo.

2. DEA Special Agent Emilio Garcia is not related to the defendant Louis Rupert Garcia.

3. Defendant Chen does not argue that the warrant was not supported by probable cause. Rider A contains numerous references to recorded coded conversations between defendant Chen

and defendant Louis Rupert Garcia, or in which defendant Chen was mentioned. *See* Rider A, pp. 13–15.

4. Agent Counihan testified that he "went up [to the area of defendant Chen's residence] about two o'clock, two hours before the scheduled arrest time." (Transcript of December 4, 1985 Suppression Hearing, hereinafter "12/4 Tr.," p. 40). He then stated that the warrant was executed at six o'clock. At the same time he said that he arrived in the area at four o'clock (12/4 Tr. p. 41). We assume that Agent Counihan misspoke initially when he said he arrived in the area around two o'clock.

that address." (12/4 Tr., p. 40). Rider A states only that "CHEN is believed to reside" at the Highway Avenue residence. (Rider A, p. 4).

While the other agents were stationed at various locations around the outside of the defendant's residence, Agent Counihan, the uniformed officer, and at least two agents approached the door. The officer rang the bell. Defendant Chen opened the door. The agents went inside, informed Chen that he was under arrest for violation of narcotics laws, and performed a "normal routine security sweep of the residence for security of other agents who were going to execute the search warrant for the residence." (12/4 Tr., p. 43).

The structure at 134 Highway Avenue has been described by Agent Counihan as an "ordinary bi-level house," (12/4 Tr., p. 43), and by defendant Chen as a "two family ... 'mother-daughter' house" (Chen Affidavit, p. 1). The house, which is owned by defendant Chen's wife, (12/4 Tr., p. 91), has three entrances: a front entrance, which was used by the agents in this case; a side entrance leading to the downstairs level; and an entrance from the backyard which leads to the upstairs portion of the house. In addition, access to the interior of the house can be had through the garage which is adjacent to the side door. *See* Defendant's Exhibits A, D and E.

On entering the house through the front entrance, the agents stepped onto a landing approximately five by six feet. The landing is located midway between the upstairs and downstairs portions of the house. There are approximately seven stairs going up, leading to the living room area of the upper level of the house. The upstairs portion of the house is in no way separated from the stairs by a door. From the entrance landing, there are also several stairs going down, terminating on another landing, bounded by a door which locks. The area between the locking downstairs door and the entire upper level of the house is completely open. (12/4 Tr., pp. 44, 58–59, Defendant's Exhibit A). In other words, while standing on the entrance landing, it is possible to see the living space upstairs, the entire stairwell area, and only the door to the lower level of the house, if that door is closed.

Besides providing easy access between the upper and lower levels of the residence, the entrance/stairwell area houses a large storage closet. That closet is located underneath the stairs leading to the upper floor and extends underneath the entrance landing itself. The door to the closet is on the lower landing within the open area that constitutes the entrance/stairwell. The closet door, which locks, is outside and completely independent of the door which leads to living area on the downstairs floor. (12/4 Tr., pp. 65–66).

Contained within the stairwell closet is a combination safe. The safe is positioned in that part of the closet which is underneath the entrance landing. (12/4 Tr. pp. 66).

The upper level of the house contains several bedrooms, a kitchen, a living room, a dining room, and a bathroom. The lower level of the house contains the stairwell storage closet. In addition, the locking door opposite the closet door opens onto a corridor which leads to a laundry room, bathroom, kitchen, den, more bedrooms, and the garage. (12/4 Tr., pp. 44–45).

Informed that he was under arrest, defendant Chen was taken upstairs to the kitchen. (12/4 Tr., pp. 47, 93). The defendant's wife and daughter, found in the bedroom during the "security sweep", were brought to sit in the upstairs living room. (12/4 Tr., p. 46, 93).

In the kitchen, Agent Counihan directed Special Agent John Emerson to give defendant Chen his rights. (12/4 Tr., p. 47) Agent Counihan heard the beginning of the rights and left the room. (12/4 Tr., p. 48). Agent Emerson read the defendant his *Miranda* rights from the card he keeps for that purpose (12/4 Tr., pp. 77–79, Government Exhibit 3). Defendant Chen responded that he understood his rights and would be willing to answer some questions. (12/4 Tr., p. 79). Agent Emerson told Agent Counihan what the defendant had said and proceeded to assist in the search of the

house. (12/4 Tr., p. 84). Defendant Chen testified only that he did not recall the reading of the *Miranda* warnings. Chen did remember being warned in his home that "what you might say would be used against you in a court of law," but testified that the warning was given to him at the "end of the search." (12/4 Tr., p. 100).

The security sweep ended and the search commenced at approximately the same time that Agent Emerson was reading defendant Chen his rights. (12/4 Tr., p. 49). The agents searched all parts of the 134 Highway Avenue house and seized evidence from the upper living level and the stairwell closet, containing the combination safe. (Government's Letter to the Court dated December 9, 1985, hereinafter "Gov't. Supp. Letter," p. 2).

Among other things, .38 grams of cocaine wrapped in tinfoil were recovered from the upstairs portion of the house. The stairwell closet held:

(1) one colt 9R–15. 223 caliber rifle, serial # SPI 33352 with 3 loaded clips;

(2) one semi-automatic UZI model B .9 mm with sling, serial # S A43931, with 1 loaded and 1 unloaded clip;

(3) one malia .22 caliber semi-automatic rifle, serial # 24332464;

(4) one Mitsui 12 gauge automatic shotgun loaded with 4 rounds of # 4 ammunition serial # S 1352553, with 5 additional rounds of # 6 ammunition;

(5) one hand gun case containing miscellaneous gun sights, slider, springs and ammunition;

(6) one box containing holsters, ammunition, ammunition pouches and miscellaneous gun parts; and

(7) one green army-type pouch containing two loaded ammunition clips.

The combination safe located deep within the closet and under the entrance landing contained:

(1) $28,000.00 in United States currency in a green-colored box with the map of the world printed on it; and

(2) a significant quantity of jewelry.

Defendant Chen has admitted his ownership of the safe as well as the jewelry and cash inside it. (12/4 Tr., pp. 107–108).

Access to the stairwell closet and safe was obtained by the agents with defendant Chen's cooperation. Agent Counihan asked the defendant to tell him where the safe was located. Chen agreed to show him. Agent Counihan then went downstairs with defendant Chen, who used the keys to unlock the closet door, and opened the combination safe. (12/4 Tr., pp. 53, 72–73, 94). It appears that passage through the locked door to the downstairs living level was also accomplished with the use of defendant Chen's keys. (12/4 Tr., p. 94).[5]

Defendant Chen testified that he was not the only person with access to the locked closet and safe. His wife's mother and father[6] also possessed the key to the stairwell closet and the combination to the safe. (12/4 Tr., pp. 106–107). In addition, the defendant's in-laws had keys to all the entrances to the house, except the front door. (12/4 Tr., pp. 106–11). Defendant Chen possesses keys for all the doors to the residence.

Defendant Chen's motion for suppression is predicated upon his claim that he and his immediate family resided only in the upstairs portion of the house at 134 Highway Avenue. He asserts that on September 6, 1984, when the DEA agents arrested him and searched his home, they also unconstitutionally searched the residence of his in-

5. The way in which the agents gained entry into the downstairs living quarters remains unclear. Defendant Chen testified that the downstairs door to that part of the house was locked and that he was brought downstairs to open it with his key. Neither Agent Counihan nor Agent Emerson could remember whether the door was open or closed when they entered the residence. Nor did they know the identity of the first agent

to enter that part of the house. (12/4 Tr., pp. 72–74, 84).

6. Defendant Chen's in-laws are Leonardo and Santa Gloria Garcia. There is no evidence regarding any relationship to defendant Louis Rupert Garcia or Agent Garcia.

laws who live through the locked downstairs door on the lower level.

Chen consequently argues that all of the physical evidence seized in that search, and particularly those items found on the lower level, should be excluded from trial on two grounds: (1) that the warrant failed to identify the place to be searched with enough specificity; and (2) that the search as executed was overbroad since the agents should reasonably have known that 134 Highway Avenue constituted two separate residences once they entered it. The defendant launches one additional argument for the suppression of the weapons, jewelry and substantial amount of cash seized from the stairwell closet and safe. He contends that since he was not given his *Miranda* rights at the outset of the search, that evidence is tainted as poisonous fruits of the inadmissible statements made during the search. Finally, defendant Chen argues that those statements leading to the discovery of the safe, and others made while agents searched, must not be admitted in evidence at his trial.

The government makes four arguments in opposition to the defendant's motion. First, the government challenges the defendant's standing to move for suppression of evidence seized from portions of the house which Chen claims was occupied by his in-laws and not by himself. Second, the government states that even if the living space on the lower level was the separate residence of the defendant Chen's in-laws, the evidence in question was not seized from that area. The closet and safe was separate from the lower level apartment and was part of the entranceway for the upstairs apartment. The government argues that the search of that open area was properly within the warrant's scope.

Third, the government argues that the agents acted in reasonable, good faith reliance on a facially valid warrant. Fourth, the government asserts that the defendant's claim that he was not read his Miranda rights is simply not credible and that in any case, the agents would have discovered the safe and its contents independent of his cooperation.

### Discussion

#### The Physical Evidence Seized From Chen's Residence

■ As a threshold matter, before defendant Chen may claim the benefits of the exclusionary rule, he must first establish that his Fourth Amendment rights have been violated. *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980) (overruled automatic standing for defendants charged with crimes of possession). Neither property ownership nor possession is sufficient to establish a Fourth Amendment interest. Rather, "an illegal search only violates the rights of those who have 'a legitimate expection of privacy in the invaded place.'" *Salvucci*, 448 U.S. at 91–92, 100 S.Ct. at 2552–53, *quoting Rakas v. Illinois*, 439 U.S. 128, 140, 99 S.Ct. 421, 428, 58 L.Ed.2d 387 (1978).

■ There is no question that defendant Chen had a privacy interest in the upstairs portion of the house at 134 Highway Avenue. The evidentiary hearing and the arguments have focussed on the nature of Chen's interest in the downstairs section of the residence. Since the government does not apparently intend to use anything seized from the downstairs living area at trial,[7] it is not necessary to decide whether Chen's in-laws were actually residing there [8] or whether Chen had a reasonable

---

7. In its letter to the Court, the government has stated that "No evidence was seized from within the living space of the lower level residence." However, the return on the warrant seems to indicate that several pieces of jewelry as well as various documents were taken from the downstairs living space. We assume that these items will not be "evidence" at trial.

8. Chen claims that his in-laws moved into the downstairs apartment at 134 Highway Avenue at the same time as he and his wife did—sometime in July, 1984. He testified, however, that his in-laws had not yet sold their home in Brooklyn and still occasionally spent the night there. Agent Counihan testified that one of the downstairs bedrooms contained a number of boxes. When he asked Chen about them, the

expectation of privacy in that part of the home.[9] At issue, then is defendant's Fourth Amendment interest in the storage closet located off the lower landing of the stairwell (from which weapons and ammunition were seized) and the safe within it (from which cash and jewelry were recovered).

■ Defendant Chen and his in-laws had a Fourth Amendment privacy interest in the locked safe inside the locked closet located in the open stairwell of Chen's home. Both defendant Chen and his in-laws had the key that unlocked the stairwell closet door. (12/4 Tr., p. 106) In addition, both knew the combination of the safe inside the closet and positioned under the entrance landing. Chen has admitted that the safe, as well as the jewelry and cash which the agents seized, was his. (12/4 Tr., p. 107).[10] Defendant Chen need not exercise sole possession or control over the place searched in order to maintain a legitimate expectation of privacy in that area. Both Chen and his in-laws could legitimately exclude others from gaining access to or using the closet or safe. They therefore have a privacy interest in those locations. *United States v. Burnett*, 493 F.Supp. 948, 952 (N.D.N.Y.1980), *aff'd*, *United States v. Cook*, 652 F.2d 55 (2d Cir.), *cert denied*, 452 U.S. 964, 101 S.Ct. 3115, 69 L.Ed.2d 975 (1981).

■ While defendant Chen has standing to assert a constitutional claim, he is not entitled to suppression of the evidence seized from the closet and safe on the grounds he has asserted in this motion. Neither the warrant nor its execution was overbroad.

The warrant appropriately identified the 134 Highway Avenue residence as the place to be searched, based on Agent Garcia's September 5 affidavit. Even if we assume that the house contains two residences, none of the evidence suggests that such a conclusion would be apparent from viewing the outside of the house. Nor would the government's surveillance have necessarily suggested to the agents that defendant Chen's in-laws maintained a separate residence within the structure. As the defendant testified, his in-laws continued to own their home in Brooklyn where they sometimes slept. (12/4 Tr., pp. 104–105). Thus, the warrant was not overbroad.

■ Even if the downstairs living area was a separate residence, the agents' search of the closet and safe was properly within the warrant's scope. Despite the fact that the entrance to the closet was on the lower landing, it was independent of the lower level living area and its separate door. The closet was separated from the downstairs living area by a locked door. However, it was in no way separated from the upper level of the house where the defendant resided. Instead, access to the closet and safe was most easily had through the front entrance to the defendant's portion of the house. *See United States v. Heldt*, 668 F.2d 1238, 1265 (D.C. Cir.1981), *cert. denied*, 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982). Moreover, the defendant testified that he did not believe that his in-laws even had a key to the front door. (12/4 Tr., pp. 109–110). The main entrance to their apartment was through the side door which led directly into the downstairs portion of the house. Therefore, the agents could have reason-

---

defendant replied that his in-laws were in the process of moving in. (12/4 Tr., pp. 52–53).

9. We do not decide, therefore, whether any control Chen may have had, or use he may have made of the downstairs apartment (for access to the garage, storage, or use of the laundry room) would be sufficient to constitute a Fourth Amendment interest in the area.

10. Defendant Chen has not conceded his possession of the weapons found in the closet though

he has testified that he was in the process of obtaining a state license for his gun shop in Nanuet, New York. (12/4 Tr., pp. 91, 101). In addition, Agent Counihan testified that when asked whether there were any weapons in the residence, defendant Chen replied that he was in the process of purchasing a gun store and that there were numerous guns in the residence. (12/4 Tr., p. 50).

ably and in good faith considered the stairwell closet and safe to be a part of the upstairs living space in which defendant Chen resided.

Defendant Chen's motion for suppression of the physical evidence seized from his home is therefore denied.

### Chen's Statements During The Search

The defendant argues that the several statements which he made during the course of the search, (see 12/4 Tr., pp. 49–56), should be suppressed because they were made before his *Miranda* rights were read to him. In addition, he contends that the evidence taken from the closet and safe should be excluded from trial as fruits of those inadmissible statements.

The government urges that the defendant's testimony on this issue was incredible. In addition, the government asserts that the closet and safe would have been independently discovered.

■ The evidence indicates that defendant Chen was informed of his *Miranda* rights at the beginning of the search and before he made any statements. Agent Counihan testified that he instructed Agent Emerson to inform Chen of his *Miranda* rights at the outset of the search. (12/4 Tr., p. 47). Agent Emerson testified that he immediately read the warnings from the card he carries with the warnings written on it. (12/4 Tr., pp. 78–79, Gov't Exhibit 3). He testified that Chen stated that he understood the warnings and that he was willing to answer questions. (12/4 Tr., p. 79). Defendant Chen, on the other hand, merely testified that he could not recall the warnings being read at the beginning of the search but did remember being asked one of the questions at the end of the search (after the agents had been in the house for approximately one and a half hours). (12/4 Tr., p. 100). His testimony was not only inconclusive but inconsistent with the statement he made on his sworn affidavit. In his affidavit, Chen claimed that he was not advised of his *Miranda* rights until he had arrived at DEA headquarters in Manhattan. (Chen Affidavit, p. 3).

The defendant's motion for suppression of the statements is therefore denied.

### The Admissibility Of The Seized Weapons

■ Because the defendant's Fourth Amendment rights have not been violated, his motion for suppression of the physical evidence and statements obtained during the search of his home has been denied. However, the weapons and ammunition seized from the stairwell closet remain inadmissible in accordance with (1) this Court's January 16, 1986 ruling striking the firearms from Overt Act 25, and (2) this Court's December 4, 1985 ruling severing the substantive firearm counts against various defendants, including defendant Chen, from the previous superceding indictment designated "SSS".[11]

■ The government argues that the seized weapons were used in furtherance of the heroin and cocaine conspiracy with which all the defendants have been charged. Despite the severance of the firearms counts, the government wishes to introduce evidence which supports the substantive count in order to prove the conspiracy. Acquittal on or withdrawal of a substantive count for possession of heroin does not preclude the jury's consideration of the same evidence with respect to the narcotics conspiracy count. *United States v. Taylor*, 562 F.2d 1345, 1353 (2d Cir.) *cert. denied, Salley v. United States*, 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083, *Green v. United States*, 434 U.S. 853, 98 S.Ct. 170, 54 L.Ed.2d 124, *Ramsey v. United States*, 434 U.S. 853, 98 S.Ct. 170, 54 L.Ed.2d 124 and *Wesley v. United States*, 434 U.S. 853, 98 S.Ct. 170, 54 L.Ed.2d 124 (1977). Nor would severance of a substantive narcotics count preclude such consideration. In this case, the severed substantive count was for possession of firearms, not drugs. The conspiracy alleged is a narcotics conspiracy. No conspiracy to import, possess, or distribute illegal weapons has been alleged. The evidence of this defendant's possession

---

11. Indictment 4S does not include any substantive weapons counts.

of weapons is at best marginally probative of his ability to engage in narcotics trafficking, particularly since there has been no showing of any relationship between the defendant's possession of these weapons and his alleged activities in furtherance of the conspiracy. Even more tentative is the evidentiary value of the weapons found in Chen's home to prove the knowing and voluntary membership of other defendants in the conspiracy.

■ Admission of arsenals of weapons allegedly possessed by a few defendants will unduly prejudice the rights of other defendants from whom no weapons have been seized and whose involvement in this narcotics conspiracy has not yet been proved. Moreover, those weapons have only limited relevance with respect to proving the existence of a narcotics conspiracy, the essence of which is the agreement by each alleged member to participate in what he or she knew to be a collective venture directed toward a common goal. *United States v. Martino,* 664 F.2d 860, 876 (2d Cir.), *cert. denied,* 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1981). *See generally United States v. Cambindo Valencia,* 609 F.2d 603, 621–29 (2d Cir.1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980).

Even if Chen's possession of weapons is probative of his participation in the alleged narcotics conspiracy on the theory that those weapons enable him to protect the drugs and himself, the government has failed to establish that connection. Nor has there been a showing that other defendants in this case are connected to the possession or use of illegal weapons. The introduction of weapons caches will do far more to unfairly bias the jury than it will to assist them in reaching their verdict.

In *United States v. Zarintash,* 736 F.2d 66, 71–72 (3d Cir.1984), the Court ruled that evidence of a large amount of money seized from the home of one of the defendants was inadmissible to prove the involvement of that defendant or her alleged co-conspirator's involvement in a drug conspiracy. In *Zarintash,* the district court had admitted the evidence [12] as probative of the defendants' ability to engage in a wholesale drug smuggling business. The Court reasoned that the defendants were not charged with receiving money. Therefore, their possession of large amounts of cash subsequent to the commission of a crime was not evidence of its fruits.

■ In the instant case, only defendant Chen was originally charged with possession of the weapons found in his home. That count was severed from the preceding "SSS" indictment and was not charged on the current 4S indictment. The possession of weapons, therefore, is not evidence of the crime charged in this trial.

More significantly, the *Zarintash* Court held that even if possession of money "could in certain circumstances be probative of participation in a drug conspiracy," 736 F.2d at 71, the evidence presented by the government was insufficient to establish that proposition. The Court further determined that (1) nothing in the record connected the seized money to the conspiracy, and (2) evidence of that amount of money was unfairly prejudicial since the jury might not believe it could have been honestly acquired. 736 F.2d at 72.

Finally, in *Zarintash* the Court held that the evidence was inadmissible as to the defendant in whose residence it was not found. "Where money found on another's property is offered against a defendant ... there must be a connection between the defendant and the property." 736 F.2d at 72.

■ Once a conspiracy has been shown, each willing and knowing member may be held responsible for the crimes done in furtherance of the conspiracy. However, an individual cannot be fairly convicted of participation in the conspiracy on the basis of acts with which he or she

---

**12.** The evidence consisted of $32,960 in cash found between the kitchen sink cabinet and the wall in one of the defendant's apartment. The other defendant had no connection with the apartment.

has no proven connection. Weighing the limited relevance of Chen's weapons against the extreme prejudice they would evoke in the mind of the jury, this Court concludes that they must be excluded from trial at least until the government shows: (1) their connection to the narcotics conspiracy, and (2) their connection to the other defendants who did not possess them.

## CONCLUSION

Defendant Chen's motion to suppress (1) the evidence seized from his home, and (2) his statements made during the course of the search of his residence, is denied. The defendant's Fourth Amendment rights have not been violated. The weapons recovered from the stairwell storage closet, as well as any other weapons seized from Chen's home, are inadmissible. Their introduction would unfairly prejudice the jury's decision in this case.

It Is So Ordered.