**UNITED STATES of America, Appellee,**

v.

**Robert Fitzgerald HILL,**

**Robert F. Hill, Appellant.**

**No. 91–5841.**

United States Court of Appeals, Third Circuit.

Argued May 20, 1992.

Decided Sept. 10, 1992.

Robert M. Simels (argued), New York City, for appellant.

William A. Behe (argued), Asst. U.S. Atty., Harrisburg, Pa., for appellee.

Before: HUTCHINSON, COWEN, and SEITZ, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Circuit Judge.

Defendant appeals from a judgment after conviction by a jury of conspiracy to distribute heroin and cocaine, 21 U.S.C. § 841(a)(1), and of conspiracy to launder money, 18 U.S.C. § 1956(a)(1)(A)(i) and 18 U.S.C. § 1956(a)(1)(B)(i).[1] This court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

At the close of the evidence in this case, the government disclosed for the first time that Agent Malloy of the Drug Enforcement Agency and Agent Monaghan of the Internal Revenue Service, both of whom testified in the trial, had also testified before the grand jury that indicted defendant. In addition, it was disclosed at the same time that Agent Craven of the United States Customs Service had also testified before the grand jury, although he had not been a witness at the trial. Before the grand jury, Agents Malloy and Craven recounted their conversations with Castagnola, an alleged co-conspirator. Castagnola described to them in detail his activities as part of a conspiracy with two other co-

---

1. He was acquitted of one count of money laundering, 18 U.S.C. § 1956(a)(1)(A)(i) and § 1956(a)(1)(B)(i) and § 1956(a)(2), and of one count of possession with intent to distribute heroin and cocaine, 21 U.S.C. § 841(a)(1) and (2).

conspirators, Santana and defendant, to import heroin and cocaine. The agents memorialized many of Castagnola's statements in written reports.

Castagnola, who did not testify before the grand jury, was the key prosecution witness at the trial. When the government disclosure took place, the defendant sought to have the testimony of the agent-witnesses stricken and the indictment dismissed or a new trial granted on the ground that he was entitled to have all such grand jury testimony for use at trial, particularly to cross-examine Castagnola. The district court denied the motion for a mistrial at that time apparently because such testimony had not been transcribed.[2] At the government's suggestion, the court permitted the case to go to the jury subject to certain later procedures.[3]

Sometime after the guilty verdict and the production by the government of the grand jury testimony, the district court entertained briefs on what it described as an outstanding motion for a mistrial. It apparently assumed that its denial of the motion at the close of the evidence was tentative. Thereafter, it filed an opinion denying that motion.

Defendant seeks reversal of the judgment of conviction and a direction that the indictment be dismissed or a new trial granted.

We turn to the claims of trial error.

## I. DISCUSSION

### A. DISCOVERY OBLIGATIONS

Defendant renews in this court his assertion that the non-production by the government of certain grand jury testimony during the trial violated, *inter alia, Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and entitled him to a new trial.[4]

■ A claim of *Brady* error presents an issue of law as well as a question of fact. Thus, we will review the district court's legal conclusions *de novo* and any findings of fact under a clearly erroneous standard. *United States v. Perdomo*, 929 F.2d 967, 969 (3d Cir.1991). If a *Brady* error was committed, this court must independently assess whether, on the record as a whole, the unavailability of the evidence for use at trial materially impaired the fairness of defendant's trial. *United States v. Agurs*, 427 U.S. 97, 112–13, 96 S.Ct. 2392, 2401–02, 49 L.Ed.2d 342 (1975).

#### (1) *BRADY* ERROR

■ Defendant contends that the government violated the rule announced in *Brady* in failing to supply defendant with the grand jury testimony of Agents Malloy and Craven before trial. The *Brady* doctrine requires the government to volunteer "evidence favorable to an accused on request ... where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97. *See also Agurs*, 427 U.S. at 110, 96 S.Ct. at 2400; *Smith v. Phillips*, 455 U.S. 209, 219–20, 102 S.Ct. 940, 947–48, 71 L.Ed.2d 78 (1982). Materials that must be disclosed are those that go the heart of

---

**2.** As the district court said in its post-verdict opinion:
We readily recognize that had the grand jury evidence been transcribed or available at the trial, we would have permitted defense counsel to further examine Castagnola as well as the agents whose grand jury testimony was not provided.
App. at 1192 n. 23.

**3.** The government's counsel described these procedures as follows:
[T]he testimony of the individuals before the Grand Jury [will] be provided to the Court and made a part of this record, and at the conclusion of the trial of course if there is an acquittal on all charges it would be of no moment. But should there be a conviction on any count the testimony would be available. And if *defense counsel believes that upon review of that testimony areas that he wanted to get into were unknown to him, or he was prevented from cross-examining effectively because of that, the matter could be addressed at that time.*

**4.** The district court addressed the alleged *Brady* rule and Jencks Act violations together. Given the controlling law, we will treat those issues separately.

the defendant's guilt or innocence and materials that might affect the jury's judgment of the credibility of a crucial prosecution witness. *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *United States v. Higgs*, 713 F.2d 39 (3d Cir.1983), *cert. denied*, 464 U.S. 1048, 104 S.Ct. 725, 79 L.Ed.2d 185 (1984).

■ Defendant argues that the grand jury testimony of Agents Malloy and Craven was *Brady* material because it contained exculpatory information, such as statements allegedly made to them by Castagnola that could have been used to further impeach Castagnola at trial. *See generally, United States v. Starusko*, 729 F.2d 256 (3d Cir.1984). He maintains, *inter alia*, that the two agents' grand jury testimony as to what they were told by Castagnola differed significantly from Castagnola's testimony at trial. His counsel conceded at oral argument, however, that these inconsistencies relate only to three incidents involving the delivery of narcotics, namely, the telephone incident, the garage incident and the hotel incident.[5] Those incidents will be addressed subsequently.

Although the government did not turn over the grand jury testimony during the trial, it did give defendant hundreds of pages of reports by Agents Malloy, Craven and Monaghan shortly before the commencement of the trial. For convenience they will be referred to as the DEA reports or the reports. Those reports summarized Castagnola's statements to them about the garage and hotel incidents, but not the telephone incident, all later addressed. Defendant concedes that the testimony of the agents before the grand jury tracked these reports nearly verbatim. Thus, such testimony did not contradict their reports. Nevertheless, defendant maintains that without access to the grand jury testimony of the agents he was seriously handicapped in his ability to destroy Castagnola's credibility at trial.

We commence our analysis by assuming the dubious proposition that the grand jury testimony of the agents was " 'evidence favorable to [the defendant].' " *Agurs*, 427 U.S. at 110 n. 17, 96 S.Ct. at 2400 n. 17 (1975) (quoting *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196). only requires that *material* evidence be disclosed by the prosecution." *Higgs*, 713 F.2d at 42.

The standard of materiality that applies to the government's non-production of alleged *Brady* information following a general request by defendant is whether "the omitted evidence creates a reasonable doubt that did not otherwise exist." *Agurs*, 427 U.S. at 112, 96 S.Ct. at 2402; *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985) (plurality opinion). Defendant seems to tacitly concede in his brief that we are only concerned here with a general request for *Brady* material, and we proceed on that basis. Thus, we must decide if the government's failure to produce the testimony was of sufficient significance that it deprived defendant of a fair trial. *Agurs*, 427 U.S. at 108, 96 S.Ct. at 2399. We turn to the materiality issue and consider the district court's delayed decision in light of these governing legal principles.

The district court found that the nondisclosure of the grand jury testimony of Agents Malloy and Craven did not constitute *Brady* violations. It determined that their testimony would not have made defendant's cross-examination of Castagnola more effective or more damaging to the government's case. The court reasoned that the grand jury testimony of Malloy and Craven essentially tracked the events as recorded in their reports, and thus "the [undisclosed] grand jury material was repetitious and cumulative of what was contained in the hundreds of pages of DEA reports." App. 1195.

As the district court said in its opinion:

---

5. Defendant does not base his claim of *Brady* error on the government's failure to timely pro-

vide Agent Monaghan's grand jury testimony.

Nothing in those grand jury minutes would have reflected on the reliability of the agents to the extent that it would have dictated a different outcome on the defendant's guilt or innocence.... Indeed, the cross-examination of Castagnola, with the benefit of the DEA reports, could not have been more effective and damaging to the government if the defense counsel had rehearsed the opportunity.

Based on its finding as to the very limited value of the undisclosed grand jury testimony for additional cross-examination purposes, the court held in effect that the grand jury testimony was not "material" to the outcome under that *Brady* requirement.

We have reviewed the DEA reports and grand jury testimony of the agents in light of the record submitted to us by defendant. This record demonstrates that, by having the agents' reports, defendant's counsel had access to the equivalent of Agent Malloy's and Craven's grand jury testimony when cross-examining Agent Malloy and Castagnola at trial. Their testimony was basically cumulative on the issue of Castagnola's credibility. Therefore, its nondisclosure did not create such prejudice as to warrant a new trial. *United States ex. rel. Marzeno v. Gengler*, 574 F.2d 730, 738 (3d Cir.1978); *United States v. Dansker*, 565 F.2d 1262 (3d Cir.1977). As Justice Fortas observed, although the prosecution must make a complete accounting of its investigatory work that reveals exculpatory evidence:

> [t]his is not to say that convictions ought to be reversed on the ground that information merely repetitious or cumulative, or embellishing of facts otherwise known to the defense or presented to the court, or without importance to the defense for purposes of the preparation of the case or for trial was not disclosed to defense counsel.

*Giles v. Maryland*, 386 U.S. 66, 98, 87 S.Ct. 793, 809, 17 L.Ed.2d 737 (Fortas, J., concurring); *quoted in Agurs*, 427 U.S. at 109 n. 16, 96 S.Ct. at 2400 n. 16; *see also United States v. Presser*, 844 F.2d 1275 (6th Cir. 1988).

The defendant, nevertheless, insists that the agents' grand jury testimony would have added to the weight of the material impeaching Castagnola that was available to him from the reports of the agents. We turn, therefore, to an examination of the alleged inconsistencies between Castagnola's trial testimony and the testimony given by the two agents to the grand jury in which they recounted what Castagnola told them. This we must do to decide whether it could have been used by defendant at trial to create a reasonable doubt as to Castagnola's credibility that did not otherwise exist.

### (a) THE TELEPHONE INCIDENT

In attempting to show that he was not a part of a conspiracy, defendant first asserts that he could have used Agent Malloy's grand jury testimony to show that Castagnola never mentioned anything to the two agents at any time prior to trial about a telephone incident in Arizona where he, Castagnola, was present with co-conspirator, Santana. At trial, Castagnola explained that he was there waiting for a shipment of heroin to arrive at a nearby airport. He also testified that he and Santana were standing at a public telephone in front of a restaurant in Tucson, Arizona and that Santana told him that defendant would be calling. When the telephone rang, Castagnola answered it. Defendant identified himself as the caller and Castagnola gave the phone to Santana. Castagnola stated that he then overheard Santana tell defendant that the shipment would be delayed.

The defense counsel attempted to impeach Castagnola's testimony about the telephone incident by pointing out that the reports containing Castagnola's disclosures to the agents did not mention the telephone incident at all. Castagnola admitted in his testimony that he did not make any statements to Agent Craven about the telephone incident. On cross-examination, Agent Malloy testified that when he prepared his report, Castagnola did not tell him about the telephone call.

These omissions were exploited by defense counsel because of his possession of the DEA reports and the testimony of the agents. They could not have been used by defendant to engage in any further useful cross-examination of Castagnola in this area in view of the testimony of Castagnola and the agents. We, therefore, conclude that the absence of the grand jury material did not prejudice defendant's ability to exploit the omissions further.

### (b) THE GARAGE INCIDENT

The second incident involved the delivery of narcotics in a rental car by Castagnola and Santana to defendant in New York City. Castagnola testified that after he and Santana parked the car near a building that served as a garage, they walked across the street. He said they thereupon saw defendant drive away in the car. Castagnola described the garage incident to the jury as follows:

[W]e were waiting for a taxicab to come, and up the Hill [sic] comes Mr. Hill. And this is the first time I'm seeing Mr. Hill. Mr. Santiago [sic] nudges me and he says, see the tall nigger across the street? That's my man, Bob Hill, and he's going to take the car and take care of it, take care of everything in there.

Mr. Hill got in the car and backed the car across the intersection, drove down the hill. That's the last time I saw the car and Mr. Hill for that period of time.

Agent Malloy gave the grand jury a more abbreviated version of Castagnola's pretrial statements about the garage incident. He said:

While they were standing across the street [from the garage] a tall black male, *later identified as Robert Hill*, came out of the garage, got into the car and drove it down the street and into the garage. This was observed by Mr. Castagnola.

(emphasis added). Similarly, Agent Craven gave a brief summary to the grand jury of Castagnola's version of the incident involving the delivery of narcotics in New York City:

... Also, one time in, I believe it was the fall of 1988 when Castagnola was driving the Grand Marquis over to New York with heroin and cocaine in the trunk, he was told to park it one day in New York City. He and Santana got out and got in a taxicab.

As they got in the taxicab, Castagnola looked over to the car and saw Robert Hill getting into the car.

Defendant argues that he was prejudiced by not being able to impeach Castagnola and Agent Malloy armed with the quoted grand jury accounts of the garage incident. Specifically, he points to three inconsistencies between the grand jury testimony and Castagnola's version of the garage incident at trial. First, he observes that neither Agent Malloy nor Craven made any reference in his grand jury testimony to the "tall nigger" comment that Castagnola described in his trial testimony. Second, he argues that the agents did not testify before the grand jury that Castagnola had told them that Santana identified defendant immediately as he drove the car out of the garage.

Defense counsel questioned Agent Malloy about these first two discrepancies at trial. Malloy admitted that Castagnola had told him about Santana's comment describing defendant but that he failed to include it in his report or to mention it before the grand jury. Defense counsel also cross-examined Castagnola as to whether he told the agents that Santana said to him: "Do you see that tall nigger across the street." Castagnola confirmed that in his debriefing, he told Agent Craven "something like that." We cannot say these limited inconsistencies in any material way impeded defense counsel's ability to maximize for the jury the impact of the inconsistencies on Castagnola's credibility.

Third, defendant argues that Agent Craven's grand jury testimony contradicted Castagnola's trial testimony on the issue of the time and location of the garage incident. Agent Craven told the grand jury that Castagnola said the garage incident happened in the fall of 1988 in Queens, New York. By contrast, Castagnola testi-

fied at trial that the garage incident occurred in Harlem in the spring of 1988. Agent Malloy was cross-examined about this discrepancy. He confirmed that Castagnola originally said to him that the garage incident occurred in the fall of 1988. Further, Malloy stated that Castagnola originally said the garage was in Queens rather than Harlem. On cross-examination, Castagnola also admitted that he may have given Agents Malloy and Craven an account of the garage incident without describing its location. Further, he acknowledged that Agent Craven's reports were inaccurate as to many details.

The record shows that defendant was not denied a full opportunity to impeach Castagnola about "inconsistencies" in prior statements he gave the agents about the garage incident. Defendant's counsel relied upon the DEA reports to impeach Castagnola as to each specific inaccuracy in Castagnola's account of that incident. These were the same inconsistencies in Castagnola's version of the incident that defendant states he would have probed had the grand jury testimony of the agents been available at trial.

We believe that defense counsel's possession of the grand jury testimony could not have enhanced his ability to cross-examine Castagnola in this area because the DEA reports in defendant's possession contained essentially the same material as is found in the two agents' grand jury testimony about Castagnola's account of the garage incident. The cross-examination that was conducted permitted the jury to decide whether the agents recorded all of the details that Castagnola testified he told them about the incident. Thus, we conclude that possession of the agents' grand jury testimony would not have permitted defendant to engage in any meaningful additional impeachment of Castagnola's credibility.

### (c) THE HOTEL INCIDENT

Castagnola testified that after defendant drove away from the garage in the rental car, he and Santana went to dinner. Specifically, he stated as follows:

We caught a taxicab, we went into the city, back to the Sheraton Center. We went to this Hill Italian restaurant that Mr. Santana likes to eat at. We had our dinner, we went back to the hotel, our car was back there ... the rental car that Mr. Hill took. It was parked ... Mr. Santana got the keys. He said, open the trunk up. I opened the trunk up, and the trunk was now empty. There was nothing left in the car.

The agents gave the grand jury somewhat differing accounts of the versions Castagnola gave to them of the hotel incident. Agent Malloy omitted many of the quoted details in describing Castagnola's pretrial statements to him regarding the hotel incident. He summarized the incident for the grand jury based on Castagnola's statements to him as follows:

... Later that evening, I believe they got the car back at the Sheraton Hotel in New York, I think, and ...

... They *met at the Sheraton Hotel* and got the car back.

(emphasis added). By contrast, Agent Craven summarized Castagnola's version of the delivery of narcotics in New York City for the grand jury without mentioning the Sheraton Hotel incident:

As they [defendant and Santana] got in the taxicab [at the garage], Castagnola looked to the car and saw Robert Hill getting into the car. Castagnola and Santana were gone approximately an hour and a half. When they came back, the car had been moved.

Castagnola got in it, drove Santana to his apartment, dropped him off, drove the car back to Pennsylvania, looked in the trunk and the trunk was empty.

This grand jury testimony by Agent Craven as to what he was told by Castagnola is inconsistent with Castagnola's trial testimony.

Defendant argues that had he timely been given Agent Craven's grand jury testimony, he would have used it in addition to the DEA reports to impeach Castagnola's statement that he checked the trunk of the rental car in New York City and found the drugs missing, rather than upon returning

to Pennsylvania. Defense counsel confronted Castagnola directly with the fact that Agent Craven's report said he checked the trunk of the rental car after driving from the hotel back to Pennsylvania. Castagnola responded that he had read the report and that "Mr. Craven got it wrong."

Finally, defendant argues that the nondisclosure of Agent Malloy's grand jury testimony substantially prejudiced him by altering his trial strategy. Specifically, he argues that had he possessed the grand jury testimony of the two agents in preparation for trial, he would not have impeached Castagnola directly with the inconsistent statements from the agents' DEA–6 reports. Instead, he would have waited until Agent Malloy testified about what Castagnola told him. At that point, says defendant, Castagnola would have been "boxed in" by his differing trial testimony. This strategy, he says, would have been more successful in casting additional doubt on Castagnola's credibility.

The defendant had in his possession the DEA reports that contained or omitted the same information he says on appeal he would have used from the agents' grand jury testimony to impeach Castagnola's version of the hotel incident. On cross-examination, Castagnola admitted that he gave Agent Craven an incomplete and inconsistent version of the New York narcotics incident. Thus, we conclude that the agents' grand jury testimony about Castagnola's portrayal of the hotel incident would not have provided defense counsel with any evidence, either affirmative or negative, that could have further impeached Castagnola in any meaningful way.

We readily acknowledge the difficulty of measuring by hindsight the effect of the inability of defense counsel to use the grand jury material, particularly in a lengthy trial covering many witnesses and exhibits. See United States v. Pflaumer, 774 F.2d 1224, 1230 (3d Cir.1985), cert. denied 475 U.S. 1046, 106 S.Ct. 1263, 89 L.Ed.2d 572 (1986). However, for the reasons we have given, we are not convinced that defendant's counsel was deprived of impeachment material of independent significance by not having the grand jury material at trial.

The unavailability of the material, therefore, did not raise a reasonable doubt that might otherwise have existed had it been disclosed. Agurs, 427 U.S. at 104, 96 S.Ct. at 2397; Higgs, 713 F.2d at 42. In our view, on this record, there was no reasonable probability that the outcome of the defendant's trial would have been different had the grand jury testimony of the agents been available to defendant for use at trial. Bagley, 473 U.S. at 682, 105 S.Ct. at 3383. Therefore, the district court did not abuse its discretion in denying a mistrial when it decided that the evidence was not material and thus no Brady violation was committed.

### (2) THE JENCKS ACT ERROR

■ Defendant also claims a violation of the Jencks Act, 18 U.S.C. § 3500 (1986). Specifically, he contends that the government's failure to produce the grand jury transcripts for trial purposes entitled him either to have the testimony of Agents Malloy and Monaghan stricken or a mistrial granted pursuant to the provision of the Jencks Act, 18 U.S.C. § 3500(d).[6] The government asserts that there was no reversible error. We review the district court's denial of defendant's motion for a mistrial based on a claim of Jencks error under an abuse of discretion standard. United States v. Gross, 961 F.2d 1097, 1104 (3d Cir.1992).

■ The Jencks Act requires that the government disclose prior recorded statements of its witnesses that are "related" to the subject matter of their testimony. Such disclosure must be made after each witness testifies on direct examination. 18

---

6. Section 3500(d) provides:
   If the United States elects not to comply with an order of the court under subsection (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared.

U.S.C. § 3500(b); *United States v. Jackson*, 649 F.2d 967, 971–72 (3d Cir.) (Jencks Act violated when government withheld prior statement of witness until close of case), *cert. denied sub nom. Blackwell v. United States*, 454 U.S. 871, 102 S.Ct. 341, 70 L.Ed.2d 176 (1981). *See also United States v. Murphy*, 569 F.2d 771, 773 (3d Cir.) (endorsing prevailing practice of government of disclosing Jencks material at an earlier time), *cert. denied* 435 U.S. 955, 98 S.Ct. 1588, 55 L.Ed.2d 807 (1978).

Disclosure by the government of Jencks statements is mandatory if the defendant makes a timely motion. 18 U.S.C. § 3500(b). Since the pretrial agreement required production of the Jencks material,[7] it is clear that the defendant complied with any request requirement with respect to the production of prior statements of government witnesses coming within the Act. Surely the government's initial explanation for its failure to produce the grand jury testimony, i.e., that defendant did not request it, is vacuous at best, particularly in view of the pretrial agreement.

█ Defendant alleges that the government deliberately withheld Jencks material. However, the district court made a finding that the government's failure to produce the agents' grand jury testimony was "inadvertent." Given that the government turned over hundreds of pages of the agents' reports that largely tracked their grand jury testimony, we cannot say that the court's finding that the non-disclosure of their grand jury testimony was unintentional is clearly erroneous. Under these circumstances, the government would have had no real reason to conceal it. Thus, we need not consider the consequence had the non-disclosure been deliberate and the testimony material.

Although the government's failure to timely produce the Jencks testimony was unintentional, it violated the Act unless the statements of the agent-witnesses could be said to be unrelated to their trial testimony, a claim the government does not make. Thus, upon disclosure by the government at the close of the evidence that it failed to provide the grand jury testimony to the defendant, the district court should have explored every avenue to determine whether there was a Jencks Act violation and, if so, what remedy might be invoked before submission of the case to the jury. Certainly it should not have been content with the vague representation of the prosecutor about when the material would be produced.

It cannot be doubted that the procedure suggested by the government to correct its error by postponing resolution of the issue,[8] and the approval of such procedure by the court tended to frustrate the purpose of the Act. 18 U.S.C. § 3500; *see also Government of the Virgin Islands v. Lovell*, 378 F.2d 799, 805–06 (3d Cir.1967). But this aberration does not end our consideration of the Jencks Act issue.

When the district court and the defendant later received the grand jury testimony, it afforded the parties an opportunity to brief the issue as to whether the non-disclosure of it at trial constituted, *inter alia*, Jencks Act error. No objection was made to this procedure apart from defendant's basic argument that he was entitled to have a definitive ruling made at the time of the trial. Thereafter, the court filed an opinion in which it seems to have concluded that the non-production of the grand jury testimony for use at trial was not critical to a finding of guilt or innocence. It appar-

---

7. The government and defendant entered into a pretrial agreement that stated:
   Jencks material will be provided today after this [pretrial] conference and it should include any reports of agency interviews or conversations with witness Castagnola.
   We need not decide whether the agreement went beyond Jencks Act requirements.

8. We realize that the district court stated in its later opinion that it did not order immediate production of the grand jury evidence because it had not been transcribed. But this was the government's burden of production. Thus, it is not clear to us why the court did not explore the feasibility of a continuance in order to obtain a transcript or consider the other Jencks Act remedies for non-production. *See* 18 U.S.C. § 3500(d). No such explanation appears in the record before us.

ently determined that the error was harmless. We turn to that serious issue.

■ Defendant asserts that he was prejudiced by the government's failure to timely produce Jencks material because it prevented him from fully cross-examining Castagnola. His claim of prejudice resulting from the non-disclosure of Jencks statements made by Agent Malloy is essentially the same as the basis for his claim of *Brady* error. The standard for determining *Brady* error is whether the undisclosed evidence on the whole record is "material." However, under the Jencks Act we must analyze the prejudice resulting from the non-disclosure of the grand jury testimony in terms of its potential usefulness to the defense, a more exacting standard. *United States v. Beasley*, 576 F.2d 626, 630 (5th Cir.1978), *cert. denied* 440 U.S. 947, 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979).

Defendant maintains that, without more, the non-disclosure of Agents Monaghan's and Malloy's grand jury testimony cannot be deemed harmless under the Jencks Act because the statements were not produced at trial for cross-examination purposes. This argument was rejected by the Supreme Court in *Rosenberg v. United States*, 360 U.S. 367, 371, 79 S.Ct. 1231, 1234, 3 L.Ed.2d 1304 (1959), which applied a harmless error rule to a Jencks Act violation. *See also Goldberg v. United States*, 425 U.S. 94, 111, 96 S.Ct. 1338, 1348, 47 L.Ed.2d 603 (1976). We must therefore consider whether the district court correctly found that the error was harmless. Defendant insists that the Jencks Act violation warrants a new trial because the non-disclosure of the testimony of Agents Monaghan and Malloy before the grand jury deprived defendant of its potential usefulness in cross-examination and, thus, could not be deemed harmless. We turn to that contention.

### (a) AGENT MONAGHAN

Defendant seeks a mistrial based on the government's non-disclosure of Agent Mon-

aghan's grand jury testimony at trial. Prior to trial, the government did produce Agent Monaghan's reports and thus the defendant had them available for use in cross-examining him at trial.[9] After first allowing Agent Monaghan's trial testimony, the district court struck most of his testimony from the record at the close of the evidence and gave the jury an instruction to disregard it. *See infra* p. 144.

In its post-verdict determination, the court found that the non-disclosure of Agent Monaghan's grand jury testimony did not warrant a new trial. It reasoned that defendant did not suffer any prejudice in cross-examining Castagnola because Monaghan "made no report of anything he got from Castagnola." On appeal, defendant has not alleged any specific example of how he was prejudiced here by the lack of Agent Monaghan's grand jury testimony at trial for cross-examination purposes in view of his possession of Monaghan's reports.

We find no error in the district court's factual finding that Agent Monaghan's reports were repetitious and cumulative of his grand jury testimony. Thus, his grand jury testimony did not contain additional impeachment material which defendant could have used to cross-examine Agent Monaghan more usefully. In consequence, we agree with the district court that any Jencks Act error resulting from the non-disclosure of his grand jury testimony was harmless.

### (b) AGENT MALLOY

Defendant also contends that he was entitled to a new trial based on the non-disclosure of Agent Malloy's grand jury testimony at trial. He asserts, in effect, that he was deprived of its possible usefulness for cross-examination purposes. The district court found that the non-disclosure of this testimony did not so prejudice defendant as to warrant a new trial.

**9.** Because defendant omitted Agent Monaghan's reports from the appellate record, they have not been independently reviewed.

■ Based on our independent review of Agent Malloy's grand jury testimony, it is clear that it did not contain any new impeachment material. As discussed earlier, Agent Malloy's DEA reports, which defendant had previously received, contain an account of the same inconsistent pretrial statements by Castagnola that Malloy summarized for the grand jury and testified to at trial. Without speculating, we can say that the alleged omissions would have been of no meaningful use to defendant. When undisclosed Jencks material is merely repetitious and/or cumulative of evidence available to the defendant at trial, the Jencks error can be deemed harmless, especially where the undisclosed pretrial statements do not contain impeachment material that would add to an already effective cross-examination of a key witness. *See e.g., United States v. Marques,* 600 F.2d 742, 748 (9th Cir.), *cert. denied,* 444 U.S. 858, 100 S.Ct. 119, 62 L.Ed.2d 77 (1979); *United States v. Crowell,* 586 F.2d 1020, 1028 (4th Cir.1978), *cert. denied* 440 U.S. 959, 99 S.Ct. 1500, 59 L.Ed.2d 772 (1979).

■ Further, defense counsel relied on the agents' reports to impeach Castagnola. Thus, his lack of access to Malloy's grand jury testimony did not handicap him from engaging in rigorous cross-examination of the witness. As a result, the government's failure to disclose Agent Malloy's testimony under the Jencks Act was harmless error.

The Supreme Court's language in *Rosenberg v. United States,* 360 U.S. 367, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959) is essentially apt here:

> [W]hen the very same information was possessed by defendant's counsel as would have been available were error not committed, it would offend common sense and the fair administration of justice to order a new trial. There is such a thing as harmless error and this clearly was such.

*Id.* at 371, 79 S.Ct. at 1234.

The district court, therefore, did not abuse its discretion in denying the motion for a mistrial based on violations of the Jencks Act.

## B. EVIDENTIARY ERROR ISSUES

### (1) ADMISSION OF THE SHOTGUN TESTIMONY

■ The defendant objected at trial to the introduction of testimony about a shotgun found by the agent in a closet in a bedroom which he shared with Cheryl Hill. We turn to that issues.

Agent Malloy and Agent Craven went to the home which Cheryl Hill apparently shared with defendant. Their purpose was to arrest the defendant on the charges for which he had been indicted. Cheryl Hill invited Agent Malloy into the house after telling him that defendant was in the kitchen. Upon finding no one there, Agents Malloy and Craven conducted a protective sweep of the premises and found the shotgun in the closet of the bedroom they shared.[10] The shotgun was registered in Cheryl Hill's name.

The indictment does not mention the shotgun. However, at trial, the government sought to elicit testimony from Agent Malloy about the gun. The defense objected to the evidence as irrelevant and highly prejudicial, but the district court allowed the testimony.

On appeal, defendant asserts that the shotgun testimony was not relevant under Rule 401 of the Federal Rules of Evidence because it was not offered to prove any element of the crime. He argues further that the weapon should not have been admitted because there was no evidence showing a nexus between the gun and any aspect of the narcotics conspiracy. He also claims that the evidence was stale since Cheryl Hill purchased the shotgun after the alleged conspiracy ended. Finally, he contends that, even if the shotgun had some relevance in establishing a conspiracy, its probative value was substantially outweighed by the possibility of prejudice. We need not decide whether all these grounds were proffered to the district court.

10. Defendant does not challenge the legality of Agent Malloy's search on appeal.

Assuming that it was error to admit the shotgun testimony into evidence, the government says it was harmless because Rule 52(a) of the Federal Rules of Criminal Evidence instructs that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." *See also* 18 U.S.C. § 3771. Therefore, in order to justify a new trial, defendant was required to show a reasonable probability that the assumed error contributed to his conviction by having a substantial influence on the minds of the jury. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256, 108 S.Ct. 2369, 2374, 101 L.Ed.2d 228 (1987) (quoting *Kotteakos v. United States*, 328 U.S. 750, 758–59, 66 S.Ct. 1239, 1244–45, 90 L.Ed. 1557 (1946)).

We find that any error resulting from the admission of the shotgun testimony was not likely to have had a substantial influence on the jury, given the other evidence of defendant's involvement · in the conspiracy. In a similar case, where the government introduced into evidence cash that had been found at the defendant's apartment on the day of his arrest, this court found the error in admitting irrelevant evidence to be harmless. *United States v. Zarintash*, 736 F.2d 66, 72 (3d Cir.1984). Furthermore, as in *Zarintash*, the prosecutor here made no mention of the shotgun in his closing argument. *Id.* Thus, we conclude that the district court's assumed error in admitting the shotgun evidence was harmless.

## (2) ADMISSION OF THE EVIDENCE OF CHERYL HILL'S FINANCIAL AFFAIRS

■ The defendant's final assignment of trial error is that the court's acts of striking the testimony and giving a curative instruction regarding Cheryl Hill's financial affairs were insufficient to remedy the prejudice incurred by the defendant.

At trial, the government offered three theories to justify the introduction of Cheryl Hill's finances to help prove that defendant committed the crimes for which he was charged. Apparently not wanting to interfere unduly with the government's presentation of its case, the court admitted the testimony in issue, over objection, subject to a showing by the government of a nexus between the testimony and the crimes with which defendant was charged.

The testimony may be summarized in abbreviated form as follows: Seventeen witnesses testified at trial that 62 money orders in amounts of $500 and $1000 were obtained from various banks in New York City and made payable to Cheryl Hill over a more than two year period in amounts that (in total) exceeded two hundred thousand dollars. The money orders came from unknown males but were sequentially numbered in amounts of less than $10,000. Federal disclosure forms—Currency Transaction Reports (CTR's)—were filed for only one of these money orders. Agent Monaghan testified that the use of money orders in this fashion is a typical method used by money launderers. He explained how this form of "structured transactions" evades the federal requirement of filing a CTR.

Further, Agent Monaghan testified on the basis of charts and summaries of financial documents introduced at trial that Cheryl Hill had unexplained income of almost $400,000 between January 1, 1987, and February 28, 1990; that she purchased $250,307 on her American Express credit card during that period using the money orders she received; that her annual income was $60,000 per year; that defendant deposited in Cheryl's checking account the $20,000 he received from work at the Car Lounge, Inc., during this same period; and that defendant had a credit card issued on Cheryl Hill's American Express account for which she guaranteed payment.

At the close of the evidence, the district court announced that in its view the government had not introduced evidence showing the necessary nexus. Thereupon, the defendant's counsel moved for a mistrial. The court denied the motion. Instead, at the court's invitation, the defendant moved that the testimony regarding the money orders and Cheryl Hill's finances be stricken. Over the government's objections, the court granted the motion and said it would give a curative instruction.

The court subsequently gave the jury the following curative instruction:

The government has presented exhibits in the form of charts and summaries. Now you should consider these charts and summaries as you would any other evidence.... [A]s to summary charts, you're entitled to disregard in part or in whole those charts if you conclude that there has been errors in the calculations, or in the analysis of attributions done therein. Most importantly, if you conclude that information was contained in the Government's charts which was not part of the trial record, then you should disregard the charts entirely.

In this case, I excluded and instructed the jury concerning certain evidence dealing with transactions by the defendant's friend, Cheryl Hill. You're not to consider this evidence during the course of your deliberations, or any chart or summaries prepared in conjunction with that testimony during their presentation. Now, this exclusion includes most, if not all of the testimony provided by the bankers, and the testimony that you have heard given to us concerning the furniture purposes [purchases] by the individual appearing from that furniture company.

App. at 1019–20.

The government argues that we need not entertain defendant's argument that only a mistrial order would have sufficed. It asserts that the testimony about Cheryl Hill's finances showed a nexus between the evidence and the charges against defendant. In consequence, it contends that such evidence was admissible and that it was error for the district court to strike it, thus rendering it unnecessary to reach the curative instruction issue. Defendant argues that the district court, in the exercise of its discretion, correctly struck the evidence of Cheryl Hill's financial affairs.

We shall assume, contrary to the government's position, that the district court, in the exercise of its discretion, did not err in striking the financial materials. On that assumption, we proceed to the defendant's contention that the striking of the evidence and the curative instruction did not remove the prejudice arising from the jury's exposure to the testimony about Cheryl Hill's financial affairs.

The general law appropriate to the resolution of the argument made by defendant is set forth in *Greer v. Miller,* 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987), where the Court said:

We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an "overwhelming probability" that the jury will be unable to follow the court's instruction, *Richardson v. Marsh,* 481 U.S. 200, 208 [107 S.Ct. 1702, 1708, 95 L.Ed.2d 176] (1987), and a strong likelihood that the effect of the evidence would be "devastating" to the defendant, *Bruton v. United States,* 391 U.S. 123, 136 [88 S.Ct. 1620, 1628, 20 L.Ed.2d 476] (1968).

*Id.* 483 U.S. at 766 n. 8, 107 S.Ct. at 3109 n. 8.

Defendant's argument goes this way: the only evidence of substantial weight connecting defendant with the conspiracy came from the testimony of the government's principal witness, Albert Castagnola; that Castagnola's credibility was seriously impugned, as the district court noted; and thus, as we translate defendant' argument, it may not have been relied on by the jury in the absence of the testimony about Cheryl Hill's financial affairs. Defendant apparently also argues that, even if it was not relied upon, the excluded evidence colored any other evidentiary basis for the verdict. Defendant therefore maintains that the extensive testimony about Hill's finances created an overwhelming probability that the jury was unable to follow the court's curative instruction as well as a strong likelihood that the evidence had a devastating effect on defendant's case.

First, can we say on this record that there was an overwhelming probability that the jury was "unable" to follow the curative instruction? That instruction was given shortly after a most severe attack on Castagnola's testimony by defense counsel in his closing argument. Assuredly, the

weight to be given to Castagnola's testimony, apart from the stricken testimony of Cheryl Hill's financial affairs, was sharply presented for the jury's consideration at that point. This is not to say that the testimony about Cheryl Hill's financial affairs was not potent. Rather, it is to say that Castagnola's credibility and the testimony of the Hill financial affairs were fairly differentiated for the jury before it retired. Thus, it was possible for the jury to evaluate Castagnola's credibility apart from the impact of Cheryl Hill's financial affairs. As we read *Greer*, the jury was therefore in a position to follow the curative instructions in arriving at its verdict. Thus, we find no overwhelming probability that the court's curative instruction was not observed by the jury.

We also conclude that the Cheryl Hill financial material was not devastating to defendant's case. Substantial support for this view is found in the fact that the jury acquitted defendant on the substantive money laundering count. Yet, the Hill financial material was devoted in large measure to such a scheme.

We therefore conclude that the curative instruction negated the assumed error in admitting the testimony about Cheryl Hill's financial affairs.

But defendant argues that the cumulative effect of the errors asserted had a devastating effect on the defense. We do not find that these errors, when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial. Thus, the district court properly denied the motion for a mistrial.

## CONCLUSION

The judgment of the district court will be affirmed.