

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-23-1994

# United States of America v. Ramos

Precedential or Non-Precedential:

Docket 93-1220

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"United States of America v. Ramos" (1994). *1994 Decisions.* Paper 57.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/57

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 93-1220 and 93-1222

_____


UNITED STATES OF AMERICA

vs.

ELIZABETH RAMOS, a/k/a Lisi

    Elizabeth Ramos,

                Appellant No. 93-1220

_____


UNITED STATES OF AMERICA

vs.

MARIA RAMOS, a/k/a "Donita"

    Maria Ramos,

                Appellant No. 93-1222

_____


APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

(D.C. Criminal Nos. 90-00431-41 and 90-00431-40)

_____


ARGUED OCTOBER 25, 1993

BEFORE:  BECKER, ROTH and LEWIS, Circuit Judges.

(Filed  June 23, 1994)

Thomas Q. Ciccone, Jr. (ARGUED)
1004 Sorrel Road
Huntingdon Valley, PA  19006

          Attorney for Appellant Elizabeth Ramos


Robert E. Madden (ARGUED)
Law Offices of Robert E. Madden
1401 Walnut Street
Suite 300
Philadelphia, PA  19102

          Attorney for Appellant Maria Ramos


Kristin R. Hayes
Robert A. Zauzmer (ARGUED)
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA  19106

          Attorneys for Appellee

_____

OPINION OF THE COURT
_____


LEWIS, Circuit Judge.

        We confront, once again, a problem which no court, trial or appellate, should have to face in this circuit. Although we have unequivocally required since 1977 that government agents preserve rough notes of interviews with prospective trial witnesses, see United States v. Vella, 562 F.2d 275 (3d Cir. 1977) (per curiam), this case presents yet another instance in which notes were destroyed.  We do not reverse here because it is

apparent to us that the destroyed notes did not constitute Jencks Act[1] or Brady[2] material and that the officers who destroyed them acted in good faith. Nonetheless, we take this opportunity to emphasize that the fortuitous mix of legal and factual circumstances which might excuse the destruction of notes, and thus constrain us to leave a conviction undisturbed, are few and far between. We should not encounter such cases in the future.

I.

Appellants Maria and Elizabeth Ramos, mother and daughter, were convicted of conspiracy to distribute cocaine and cocaine base, possession of cocaine with intent to distribute and related charges arising out of their involvement in a family-operated drug ring. The original indictment targeting the Ramos family conspiracy charged 39 defendants, including three of Maria Ramos's sons, with various drug distribution and possession charges. The majority of those charged began to cooperate, and a superseding indictment followed. Maria Ramos and Elizabeth Ramos were first charged in the superseding indictment.

At trial, the government's case against the Ramoses was supported by the testimony of 13 co-conspirators who cooperated pursuant to plea agreements. The government agrees that "the testimony of co-conspirators was the cornerstone of the evidence against the defendants." Government's brief at 12 n.2.

Detective James Moffit and his partner, Sergeant Gerald Logan, interviewed the cooperating witnesses and took notes

---

[1] 18 U.S.C. § 3500.
[2] Brady v. Maryland, 373 U.S. 83 (1963).

during their initial debriefings, or "proffers," in late 1990 or early 1991. Both were long-time Philadelphia police officers who began working with the federal government on this investigation in the fall of 1989 in association with the federal Drug Enforcement Administration ("DEA"). Logan described himself as being "assigned" to the DEA; Moffit termed his position as one in which he was "detailed" or "cross-designated" to the DEA. App. at 1060, 1277, 2263. Both had been "sworn in" by the DEA and were issued DEA credentials. See app. at 1278.

It is undisputed that Moffit and, apparently, Logan[3] destroyed their notes after they prepared summary reports ("DEA-6s"). Appellants contend that this destruction mandated suppression of the officers' testimony or a mistrial, both of which the district court denied. (Elizabeth Ramos had moved for production of the notes prior to trial, while Maria Ramos first raised the issue of the destruction of the notes during Moffit's cross-examination at trial; it was her counsel who initially moved for a mistrial and for suppression of Moffit's testimony. See generally app. at 1285-96.)

---

[3]Though not disputed, whether both officers or only Moffit destroyed notes remains unclear. Appellants focus on Moffit, but the government speaks in the plural, discussing the "officers' destruction of notes." Because both Moffit and Logan took notes, we will presume for purposes of this appeal that they were both involved in or at least aware of their destruction. The issue becomes material only when discussing their prior training, a point at which both appellants and the government seem content to rest on a discussion of Moffit's experience in any event. See infra note 7.

The district court exercised jurisdiction over this case pursuant to 18 U.S.C. § 3231, and we do so pursuant to 28 U.S.C. § 1291. To the extent appellants contend that the government's actions violated the rule set forth in Brady v. Maryland, 373 U.S. 83 (1963), we review the district court's legal conclusions de novo and its factual findings for clear error. United States v. Thornton, 1 F.3d 149, 158 (3d Cir. 1993); United States v. Hill, 976 F.2d 132, 134 (3d Cir. 1992). We review the district court's denial of the appellants' motion based on a claim of Jencks error for abuse of discretion. Hill, 976 F.2d at 139.[4]

## II.

Criminal pretrial discovery is, of course, vastly different from discovery in civil cases. In contrast to the wide-ranging discovery permitted in civil cases, Rule 16 of the Federal Rules of Criminal Procedure delineates the categories of information to which defendants are entitled in pretrial discovery in criminal cases, with some additional material being

---

[4] In addition to the destruction of notes issue, appellants contend that their trial was marred by impermissible vouching because the government (1) referred to the truthfulness provisions of the cooperating witnesses' plea agreements, (2) elicited certain testimony from Moffit about accomplices who had not testified and referred to those persons in its closing argument, and (3) referred to non-testifying family members in its closing argument. The Ramoses also argue that in describing the plea agreements during its charge to the jury, the trial court improperly instructed that "it is up to the government to decide whether the defendant has cooperated and provided truthful information," thus buttressing the government's effort to bolster those witnesses' credibility. We find no merit to these contentions.

discoverable in accordance with statutory pronouncements and the due process clause of the Constitution.  The Jencks Act requires that after each government witness has testified on direct examination, the government must produce to the defense "any statement" made by the witness which relates to his or her testimony.  In Brady, the Supreme Court held that due process required that the government produce all "exculpatory" evidence, which includes both "[m]aterials . . . that go to the heart of the defendant's guilt or innocence and materials that might affect the jury's judgment of the credibility of a crucial prosecution witness."  United States v. Hill, 976 F.2d 132, 134-35 (3d Cir. 1992).  See Giglio v. United States, 405 U.S. 150, 154 (1972); United States v. Perdomo, 929 F.2d 967, 970 (3d Cir. 1991) (citing Moore v. Illinois, 408 U.S. 786 (1972) ("[a] valid Brady complaint contains three elements:  (1) the prosecution must suppress or withhold evidence, (2) which is favorable, and (3) material to the defense")).  See generally United States v. Starusko, 729 F.2d 256, 260 (3d Cir. 1984).

In United States v. Vella, 562 F.2d 275 (3d Cir. 1977) (per curiam), we held that "the rough interview notes of F.B.I. agents should be kept and produced so that the trial court can determine whether the notes should be made available to the [defendant] under the rule of Brady . . . or the Jencks Act." Vella, 562 F.2d at 276.  See also United States v. Ammar, 714 F.2d 238, 259 (3d Cir. 1983) (extending rule to require preservation of rough drafts of agents' reports); United States v. Harris, 543 F.2d 1247 (9th Cir. 1976); United States v.

Harrison, 524 F.2d 421, 428–29 (D.C. Cir. 1975).  Since then, the DEA has apparently adopted an internal policy requiring such retention.  See government's brief at 34.  But we need not decide whether our holding in Vella or the DEA's policy was followed in this case; there is simply no question that they were not.  Instead, the only question before us is:  what should be done about a clear failure to follow established rules and policy?

In Vella and Ammar, we explained the requirement for retaining rough notes of interviews in such unambiguous terms that it would be futile to try to elucidate further here, for what we meant cannot be stated more clearly.  See Ammar, 714 F.2d at 259 ("the government must retain and, upon motion, make available to the district court both the rough notes and the drafts of reports of its agents to facilitate the district court's determination whether they should be produced"); Vella, 562 F.2d at 276 ("rough interview notes should be kept and produced").  Though we did not address the point directly, arguably a case could be made that the unequivocal tone of our decisions in these cases implied that we would reverse a conviction where the government failed to abide its responsibility (indeed, its legal obligation), no matter what factors might have contributed to the destruction of notes or drafts of reports.  Cf. United States v. Parker, 549 F.2d 1217 (9th Cir. 1977) (violation of Harris rule "might arguably" have required reversal but for court's decision not to apply it retroactively).  We have not previously stated explicitly whether

our holding in Vella established a per se rule or one which is subject to a "good faith exception" or harmless error analysis.

A careful reading of both Vella and Ammar, however, suggests that we did not imply a rule which would automatically preclude evidence based upon destroyed rough notes, without regard for other considerations. In Vella, without elaboration, we stated that "in light of the other evidence in the record, as well as the apparent good faith administrative decision which led to the destruction of the notes, the error must be considered harmless." Vella, 562 F.2d at 276. Similarly, in Ammar, we refused to find an alleged Jencks Act violation in the destruction of rough drafts because (1) the handwritten drafts had not been shown to the agent's supervisor for adoption or approval, and (2) the agent had testified that the rough drafts and final reports were "substantially identical," so that even if the drafts were Jencks Act material their destruction was harmless. Ammar, 714 F.2d at 259-60. We see no reason not to undertake a similar analysis in this case; the mere fact that Vella and Ammar each established rules for the government to follow does not suggest that we intended the automatic suppression of evidence when those rules are violated.

Our decision is informed by Arizona v. Youngblood, 488 U.S. 51 (1988), a case in which the Arizona police had failed to preserve semen samples from the body and clothing of a victim of a sexual assault. The defendant contended that the failure to preserve the evidence had deprived him of due process. The Supreme Court disagreed. It concluded that although Brady "makes

the good or bad faith of the State irrelevant when [it] fails to disclose to the defendant material exculpatory evidence[,] the due process clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." Youngblood, 488 U.S. at 57. Thus, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Id. at 58. See also California v. Trombetta, 467 U.S. 479 (1984) (police officers' failure to preserve breath samples which had been subjected to Intoxilyzer testing did not violate the Constitution when (1) the officers were acting "in good faith and in accord with their normal practice," (2) the chances that preserved samples would have been exculpatory were "extremely low," and (3) the defendants had other means of challenging the Intoxilyzer results); United States v. Deaner, 1 F.3d 192, 199-201 (3d Cir. 1993) (district court did not err in relying on the government's evidence of the weight of marijuana plants in sentencing defendant despite the government's destruction of the plants without producing them to the defendant); United States v. Barton, 995 F.2d 931 (9th Cir. 1993) (government's negligent destruction of marijuana plants which possibly could have disproved agents' statement in affidavit of probable cause held not violative of due process absent a showing of bad faith on the agents' part).

Youngblood and Trombetta indicate that we should apply a "good faith" test to destruction of evidence.  In this case, since the appellants raised Brady and Jencks Act issues, we will first proceed to analyze whether either Brady or Jencks Act material might have been present in the destroyed notes.  Only after ascertaining that it was not present will we move on to a good faith analysis.[5]

A.

We may quickly dispose of the Jencks Act issues.  The Jencks Act requires a court, upon motion of the defendant and after direct examination of a government witness, to order the United States to produce to the defense "any statement . . . of the witness in [its] possession . . . which relates to the subject matter as to which the witness has testified."  18 U.S.C. § 3500(b).  Leaving aside "statements" which are transcriptions or recordings of grand jury testimony, a "statement" within the meaning of the Jencks Act is:

> (1)  a written statement made by said witness and signed or otherwise adopted or approved by him; [or]
>
> (2)  a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded

---

[5]  In one respect, the issue we address here is both simple and benign, for, as we discuss below, there is neither a reasonable possibility of the destroyed notes having contained Jencks Act or Brady material nor a scintilla of evidence tending to show that the destruction occurred in bad faith.

> contemporaneously with making of such oral
> statement.

18 U.S.C. § 3500(e).

The destroyed rough notes fall into neither of these categories. They clearly do not constitute "statements" of the cooperating co-conspirators, for they are neither "substantially verbatim recitals" of what those witnesses said during their proffers nor writings which they signed or otherwise adopted or approved.[6] United States v. Gross, 961 F.2d 1097, 1104-05 (3d Cir. 1992); United States v. Starusko, 729 F.2d 256, 263 (3d Cir. 1984); cf. Palermo v. United States, 360 U.S. 343, 350 (1959) (it would be "grossly unfair" to permit defendants to attempt to impeach witnesses with statements "which could not fairly be said to be the witness' [sic] own rather than the product of the investigator's selections, interpretations and interpolations"). See United States v. Foley, 871 F.2d 235, 238-39 (1st Cir. 1989); United States v. Ricks, 817 F.2d 692, 698 (11th Cir. 1987). Nor are they "statements" of Moffit or Logan, for they are by no means "substantially verbatim" recitals of anything Moffit or Logan said. Further, unlike the DEA-6s themselves, they do not constitute writings which the officers later adopted in any way. See United States v. Griffin, 659 F.2d 932, 937-38 (9th Cir.

---

[6]    See app. at 392-93, 570, 803, 1048-49, 1069, 1081, 1083, 1491, 1530-31, 1633 (testimony of Moffit and various witnesses testifying pursuant to plea agreements). We may rely on such secondary evidence in determining whether missing or destroyed notes contained Jencks Act material. See United States v. Cole, 634 F.2d 866, 869 (5th Cir. 1981) (per curiam).

1981).  Accordingly, we conclude that the destroyed notes did not constitute Jencks Act material.

B.

The Brady issue is more complex.  In Vella, we relied on United States v. Harrison, 524 F.2d 421 (D.C. Cir. 1975), in requiring preservation of rough notes.  The Harrison court explained:

> It seems too plain for argument that rough notes from any witness interview could prove to be Brady material.  Whether or not the prosecution uses the witness at trial, the notes could contain substantive information or leads which would be of use to the defendants on the merits of the case.  If the witness does testify, the notes might reveal a discrepancy between his testimony on the stand and his story at a time when the events were fresh in his mind.  The discrepancy would obviously be important to use in impeaching the witness' [sic] credibility.  The possible importance of the rough notes for these purposes is not diminished in cases where the prosecutor turns over to the defense the . . . reports.  The . . . reports contain the agent's narrative account of the witness's statement, prepared partly from the rough notes and partly from the agent's recollection of the interview.  Although the agents are trained to include all the pertinent information in the . . . report, there is clearly room for misunderstanding or outright error whenever there is a transfer of information in this manner.  In the best of good faith, the statement . . . may, to some degree at least, reflect the input of the agent.  In such a situation, the information contained in the rough notes taken from the witness himself might be more credible and more favorable to the defendant's position.

Id. at 427–28 (footnote omitted).  If, as some believe, our ability to know something is largely determined by that to which

we have been exposed and by the varying capacities of our sensory perception and reasoning skills, then Harrison essentially states the obvious:  it is impossible to know for certain whether or not rough notes which have been destroyed would have been exculpatory, or whether their exculpatory nature would have been apparent to the agents at the time of the destruction, because they are no longer here for us to see, to analyze, to interpret. Whatever truths might have been gleaned from them, and whatever contributions these truths might have offered to the doing of justice, were destroyed along with the notes themselves.  Thus, if the evil sought to be eliminated by requiring preservation of notes was the uncertainty about whether the notes would have contained Brady material, then excusing their destruction as long as it was done in good faith would seem to undercut both the rule and its purpose.  It is difficult to imagine, for example, how a court could determine whether the exculpatory nature of an agent's notes would have been apparent to the agent before destruction without first reviewing the notes.  Similarly, without knowing what inconsistencies, if any, the notes contained, a court will undoubtedly find it difficult (if not impossible) to decide whether the defendant seeking production had other opportunities to make the same arguments he or she could have made with the notes.

Nevertheless, the mere possibility that the destroyed notes might have included Brady material, without more, is insufficient to implicate such concerns.  We think it unwise to infer the existence of Brady material based upon speculation

alone.  Instead, we favor the approach taken by the United States Court of Appeals for the Ninth Circuit in Griffin, that "unless [a] defendant is able to raise at least a colorable claim that the investigator's discarded rough notes contained evidence favorable to [him] and material to his claim of innocence or to the applicable punishment -- and that such exculpatory evidence has not been included in any formal interview report provided to defendant -- no constitutional error of violation of due process will have been established."  Griffin, 659 F.2d at 939.  At the risk of pushing understatement to the brink of rationality, we acknowledge, as did the court in Griffin, that attempting to make such a showing by examining the agents and interviewees or using other documentary evidence is "not as ideal" as examination of the notes themselves would be.  To conclude otherwise, however, would be to read Brady too broadly, requiring "the government to preserve all material even arguably related to the criminal transaction."  Id. at 939 & n.7.

In this case the defendants have offered nothing beyond their speculation that the agents' notes might have contained Brady material.  In response, the government indicated that Moffit had incorporated everything contained within the notes into the DEA-6s.  App. at 1448, 1452.  Cf. app. at 1282.  There was no suggestion by anyone in a position to know (that is, the witnesses or the officers) that the DEA-6s differed in any way from the oral proffers that would have been reflected in the destroyed notes.  Further, at trial the district court examined all the notes that had been preserved from later witness proffers

and ordered production of about 20 pages.  These pages did not reveal any Brady material and defense counsel chose not even to cross-examine Moffit with regard to them.  (While we draw no firm conclusion here, this at least tends to indicate that the chances of damaging material existing in the destroyed notes were somewhat remote, assuming the officers were consistent throughout, both in their method and practice of transcribing their written notes.)  Appellants have not raised a colorable claim that the destroyed notes contained exculpatory material that was material to their defense and was not included within the DEA-6s.  Therefore, we conclude that the destruction of the notes did not constitute a Brady violation.  Cf. United States v. Michaels, 796 F.2d 1112, 1116 (9th Cir. 1986); United States v. American Radiator & Standard Sanitary Corp., 433 F.2d 174, 202 (3d Cir. 1970) (both holding that defendants' mere speculation that Brady material might be present is insufficient to permit perusal of government files).

C.

It is undisputed that Moffit and Logan destroyed their notes in good faith. They are Philadelphia police officers, not DEA agents, and Moffit testified that the federal practice of retaining records of a cooperating-witness interview is "completely different" from the Philadelphia police department's. App. at 1065-66. In the Philadelphia police department, at least at the time the events with which we are concerned took place, the officers "consider [notes] sensitive material" that they "don't leave . . . around at all." Id. at 1106. Philadelphia police officers retain the reports they draft based upon their notes but destroy the notes. Id. at 1108-09.

Moreover, Moffit received no special training and no orientation for his work with the DEA. App. at 1278.[7] He was instructed as to the "general mechanics" of DEA-6s but was not told to preserve the notes he used in compiling the DEA-6s. Id. at 1280-83, 1285. Moffit testified that he believed he was following office procedure because he saw others destroying notes. Id. at 1283.

We are well aware of the critical contribution the DEA and its agents make to the national effort to control illegal drug trafficking and to combat illegal drug use. Indeed, we have not lost sight of the fact that the issue before us is derived

---

[7]The initial Ramos indictment was the first federal indictment Moffit had assisted in procuring. App. at 1064. As noted previously, both appellants and the government have generally relied on Moffit's testimony regarding the training he received as representing the training both officers received. See supra note 3.

precisely from that laudable and important campaign.  But we cannot approve of the way in which Moffit and, presumably, Logan were trained.  It is regrettable that the DEA failed to instruct officers affiliated with it to preserve the rough notes taken at proffer sessions, particularly after we have made it abundantly clear that it is required to do so and its own internal guidelines mandate that it do so.  Our affirmance in this case is in no way intended to encourage or to permit lax compliance with the dictates of due process under the guise of good-faith ignorance.  To the contrary, we expect more of the government.  And if there were evidence indicating a deliberate or, under circumstances not present here, even a negligent contravention of the Vella rule, we would very likely reach a different conclusion.

As we have noted, however, in this case it seems clear that the officers (who, significantly, were only loosely connected to the DEA) were entirely unaware that they should preserve their notes, and that their past experience indicated that they were to destroy them.  The defense has produced no evidence to the contrary, relying instead on speculation and the argument that contravention of the Vella rule automatically constitutes bad faith.  See E. Ramos's brief at 18-23.  We cannot rest our decision in this case on such conclusory allegations, and for the reasons discussed above, we decline the invitation to fashion a per se rule in this area.

III.

In conclusion, because the destroyed notes did not constitute Jencks Act materials, there is nothing beyond speculation to indicate that they contained <u>Brady</u> material, and the officers clearly acted in good faith in destroying them, we will affirm the district court's denial of appellants' motion for suppression or, in the alternative, a mistrial.  The judgment of conviction is affirmed.